## CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. *v.* PUBLIC SERVICE COMMISSION OF NEW YORK

No. 79–134.   Argued March 17, 1980—Decided June 20, 1980

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, and MARSHALL, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 544. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 544. BLACKMUN, J., filed a dissenting opinion, in Parts I and II of which REHNQUIST, J., joined, *post*, p. 548.

*Joseph D. Block* argued the cause for appellant. With him on the briefs was *Peter P. Garam.*

*Peter H. Schiff* argued the cause for appellee. With him on the brief was *Howard J. Read.**

---

*Briefs of *amici curiae* urging reversal were filed by *Walter L. Stratton* for the American Association of Advertising Agencies, Inc.; by *Stanley T. Kaleczyc* for the Chamber of Commerce of the United States of America; by *Burt Neuborne* for Long Island Lighting Co.; by *Edward H. Dowd, Myrna P. Field,* and *John Cannon* for the Mid-Atlantic Legal Foundation et al.; by *Edwin P. Rome* and *William H. Roberts* for Mobil Corp.; by *Malcolm H. Furbush, Joseph I. Kelly, Robert L. Harris, Gordon Pearce, Guenter S. Cohn, Timothy W. Tower, John Bury,* and *Leslie Christian Hauck* for Pacific Gas and Electric Co. et al.; and by *Daniel J. Popeo* for the Washington Legal Foundation.

Briefs of *amici curiae* urging affirmance were filed by *Kristin Booth Glen* and *Melvin L. Wulf* for the Natural Resources Defense Council et al.; and by *Harold I. Abramson* and *John C. Esposito* for the New York State Consumer Protection Board et al.

Briefs of *amici curiae* were filed by *Cameron F. MacRae* for the Edison

MR. JUSTICE POWELL delivered the opinion of the Court.

The question in this case is whether the First Amendment, as incorporated by the Fourteenth Amendment, is violated by an order of the Public Service Commission of the State of New York that prohibits the inclusion in monthly electric bills of inserts discussing controversial issues of public policy.

I

The Consolidated Edison Company of New York, appellant in this case, placed written material entitled "Independence Is Still a Goal, and Nuclear Power Is Needed To Win the Battle" in its January 1976 billing envelope. The bill insert stated Consolidated Edison's views on "the benefits of nuclear power," saying that they "far outweigh any potential risk" and that nuclear power plants are safe, economical, and clean. App. 35. The utility also contended that increased use of nuclear energy would further this country's independence from foreign energy sources.

In March 1976, the Natural Resources Defense Council, Inc. (NRDC), requested Consolidated Edison to enclose a rebuttal prepared by NRDC in its next billing envelope. *Id.,* at 45–46. When Consolidated Edison refused, NRDC asked the Public Service Commission of the State of New York to open Consolidated Edison's billing envelopes to contrasting views on controversial issues of public importance. *Id.,* at 32–33.

On February 17, 1977, the Commission, appellee here, denied NRDC's request, but prohibited "utilities from using bill inserts to discuss political matters, including the desirability of future development of nuclear power." *Id.,* at 50. The Commission explained its decision in a Statement of Policy on Advertising and Promotional Practices of Public Utilities issued on February 25, 1977. The Commission concluded

---

Electric Institute; and by *William W. Becker* for the New England Legal Foundation.

that Consolidated Edison customers who receive bills containing inserts are a captive audience of diverse views who should not be subjected to the utility's beliefs. Accordingly, the Commission barred utility companies from including bill inserts that express "their opinions or viewpoints on controversial issues of public policy." App. to Juris. Statement 43a. The Commission did not, however, bar utilities from sending bill inserts discussing topics that are not "controversial issues of public policy." The Commission later denied petitions for rehearing filed by Consolidated Edison and other utilities. *Id.,* at 59a.

Consolidated Edison sought review of the Commission's order in the New York state courts. The State Supreme Court, Special Term, held the order unconstitutional. 93 Misc. 2d 313, 402 N. Y. S. 2d 551 (1978). But the State Supreme Court, Appellate Division, reversed, 63 App. Div. 2d 364, 407 N. Y. S. 2d 735 (1978), and the New York Court of Appeals affirmed that judgment. 47 N. Y. 2d 94, 390 N. E. 2d 749 (1979). The Court of Appeals held that the order did not violate the Constitution because it was a valid time, place, and manner regulation designed to protect the privacy of Consolidated Edison's customers. *Id.,* at 106–107, 390 N. E. 2d, at 755. We noted probable jurisdiction, 444 U. S. 822 (1979). We reverse.

## II

The restriction on bill inserts cannot be upheld on the ground that Consolidated Edison is not entitled to freedom of speech. In *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765 (1978), we rejected the contention that a State may confine corporate speech to specified issues. That decision recognized that "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *Id.,* at 777. Because the state action limited protected speech, we concluded that the

regulation could not stand absent a showing of a compelling state interest. *Id.*, at 786.[1]

The First and Fourteenth Amendments guarantee that no State shall "abridg[e] the freedom of speech." See *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 500–501 (1952). Freedom of speech is "indispensable to the discovery and spread of political truth," *Whitney* v. *California,* 274 U. S. 357, 375 (1927) (Brandeis, J., concurring), and "the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . ." *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (Holmes, J., dissenting).[2] The First and Fourteenth Amendments remove "governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity. . . ." *Cohen* v. *California,* 403 U. S. 15, 24 (1971).[3]

This Court has emphasized that the First Amendment "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern. . . ." *Thornhill* v.

---

[1] Nor does Consolidated Edison's status as a privately owned but government regulated monopoly preclude its assertion of First Amendment rights. See *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n, post,* at 566–568. We have recognized that the speech of heavily regulated businesses may enjoy constitutional protection. See, *e. g., Friedman* v. *Rogers,* 440 U. S. 1 (1979); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 763–765 (1976). Consolidated Edison's position as a regulated monopoly does not decrease the informative value of its opinions on critical public matters. See generally *Public Media Center* v. *FCC,* 190 U. S. App. D. C. 425, 428, 429, 587 F. 2d 1322, 1325, 1326 (1978); *Pacific Gas & Electric Co.* v. *City of Berkeley,* 60 Cal. App. 3d 123, 127–129, 131 Cal. Rptr. 350, 352–353 (1976).

[2] Freedom of speech also protects the individual's interest in self-expression. *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 777, n. 12 (1978); see T. Emerson, The System of Freedom of Expression 6 (1970).

[3] See also A. Meiklejohn, Political Freedom 35–36 (1965).

*Alabama,* 310 U. S. 88, 101–102 (1940); see *Mills* v. *Alabama,* 384 U. S. 214, 218 (1966). In the mailing that triggered the regulation at issue, Consolidated Edison advocated the use of nuclear power. The Commission has limited the means by which Consolidated Edison may participate in the public debate on this question and other controversial issues of national interest and importance. Thus, the Commission's prohibition of discussion of controversial issues strikes at the heart of the freedom to speak.

### III

The Commission's ban on bill inserts is not, of course, invalid merely because it imposes a limitation upon speech. See *First National Bank of Boston* v. *Bellotti, supra,* at 786. We must consider whether the State can demonstrate that its regulation is constitutionally permissible. The Commission's arguments require us to consider three theories that might justify the state action. We must determine whether the prohibition is (i) a reasonable time, place, or manner restriction, (ii) a permissible subject-matter regulation, or (iii) a narrowly tailored means of serving a compelling state interest.

### A

This Court has recognized the validity of reasonable time, place, or manner regulations that serve a significant governmental interest and leave ample alternative channels for communication. See *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93 (1977); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 771 (1976). See also *Kovacs* v. *Cooper,* 336 U. S. 77, 104 (1949) (Black, J., dissenting). In *Cox* v. *New Hampshire,* 312 U. S. 569 (1941), this Court upheld a licensing requirement for parades through city streets. The Court recognized that the regulation, which was based on time, place, or manner criteria, served the municipality's legitimate interests in regulating traffic, securing public order, and insuring that simultaneous parades did not pre-

vent all speakers from being heard. *Id.*, at 576. Similarly, in *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972), we upheld an antinoise regulation prohibiting demonstrations that would disturb the good order of an educational facility. The narrowly drawn restriction constitutionally advanced the city's interest "in having an undisrupted school session conducive to the students' learning. . . ." *Id.*, at 119. Thus, the essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate governmental goals. No matter what its message, a roving sound truck that blares at 2 a. m. disturbs neighborhood tranquility.

A restriction that regulates only the time, place, or manner of speech may be imposed so long as it is reasonable. But when regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited "merely because public officials disapprove the speaker's views." *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (1951) (Frankfurter, J., concurring in result). As a consequence, we have emphasized that time, place, and manner regulations must be "applicable to all speech irrespective of content." *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209 (1975); see *Carey* v. *Brown, ante,* at 470. Governmental action that regulates speech on the basis of its subject matter " 'slip[s] from the neutrality of time, place, and circumstance into a concern about content.' " *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 99 (1972), quoting Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 29. Therefore, a constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech.[4]

---

[4] See also *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93–94 (1977); *Papish* v. *University of Missouri Curators,* 410 U. S. 667, 670 (1973) (*per curiam*).

The Commission does not pretend that its action is unrelated to the content or subject matter of bill inserts. Indeed, it has undertaken to suppress certain bill inserts precisely because they address controversial issues of public policy. The Commission allows inserts that present information to consumers on certain subjects, such as energy conservation measures, but it forbids the use of inserts that discuss public controversies. The Commission, with commendable candor, justifies its ban on the ground that consumers will benefit from receiving "useful" information, but not from the prohibited information. See App. to Juris. Statement 66a–67a. The Commission's own rationale demonstrates that its action cannot be upheld as a content-neutral time, place, or manner regulation.

B

The Commission next argues that its order is acceptable because it applies to all discussion of nuclear power, whether pro or con, in bill inserts. The prohibition, the Commission contends, is related to subject matter rather than to the views of a particular speaker. Because the regulation does not favor either side of a political controversy, the Commission asserts that it does not unconstitutionally suppress freedom of speech.

The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. As a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago* v. *Mosley, supra,* at 95; see *Cox* v. *Louisiana,* 379 U. S. 536, 580–581 (1965) (opinion of Black, J.). In *Mosley,* we held that a municipality could not exempt labor picketing from a general prohibition on picketing at a school even though the ban would have reached both pro- and anti-union demonstrations. If the marketplace

of ideas is to remain free and open, governments must not be allowed to choose "which issues are worth discussing or debating . . . ." 408 U. S., at 96. See also *Erznoznik* v. *City of Jacksonville, supra*, at 214–215; *Tinker* v. *Des Moines School District*, 393 U. S. 503, 510–511 (1969). To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.

Nevertheless, governmental regulation based on subject matter has been approved in narrow circumstances.[5] The court below relied upon two cases in which this Court has recognized that the government may bar from its facilities certain speech that would disrupt the legitimate governmental purpose for which the property has been dedicated. 47 N. Y. 2d, at 107, 390 N. E. 2d, at 755. In *Greer* v. *Spock*, 424 U. S. 828 (1976), we held that the Federal Government could prohibit partisan political speech on a military base even though civilian speakers had been allowed to lecture on other subjects. See *id.*, at 838, n. 10.[6] In *Lehman* v. *Shaker*

---

[5] For example, when courts are asked to determine whether a species of speech is covered by the First Amendment, they must look to the content of the expression. See *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n, post*, at 561–563 (commercial speech); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974) (libel); *Miller* v. *California*, 413 U. S. 15 (1973) (obscenity); *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572–573 (1942) (fighting words). Compare *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 746–747 (1978) (opinion of STEVENS, J.), and *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 70–71 (1976) (opinion of STEVENS, J.), with *FCC* v. *Pacifica Foundation, supra*, at 761 (opinion of POWELL, J.), 762–763 (BRENNAN, J., dissenting), and *Young* v. *American Mini Theatres, Inc., supra*, at 87 (STEWART, J., dissenting) (indecent speech).

[6] The necessity for excluding partisan speech was based upon the traditional policy "of keeping official military activities . . . wholly free of entanglement with partisan political campaigns of any kind." 424 U. S., at 839. Thus, the Court's decision construed the public right of access in light of "the unique character of the Government property upon which the expression is to take place." *Id.*, at 842 (POWELL, J., concurring).

*Heights,* 418 U. S. 298 (1974) (opinion of BLACKMUN, J.), a plurality of the Court similarly concluded that a city transit system that rented space in its vehicles for commercial advertising did not have to accept partisan political advertising. The municipality's refusal to accept political advertising was based upon fears that partisan advertisements might jeopardize long-term commercial revenue, that commuters would be subjected to political propaganda, and that acceptance of particular political advertisements might lead to charges of favoritism. *Id.,* at 302, 304.[7]

*Greer* and *Lehman* properly are viewed as narrow exceptions to the general prohibition against subject-matter distinctions. In both cases, the Court was asked to decide whether a public facility was open to all speakers.[8] The plurality in *Lehman* and the Court in *Greer* concluded that partisan political speech would disrupt the operation of governmental facilities even though other forms of speech posed no such danger.

The analysis of *Greer* and *Lehman* is not applicable to the Commission's regulation of bill inserts. In both cases, a private party asserted a right of access to public facilities. Consolidated Edison has not asked to use the offices of the

---

[7] Mr. Justice Douglas, who concurred in the judgment in *Lehman,* did not view "the content of the message as relevant either to petitioner's right to express it or to the commuters' right to be free from it." 418 U. S., at 308. Rather, Mr. Justice Douglas upheld the municipality's actions because commuters were a captive audience. *Id.,* at 306–308. The Consolidated Edison customers who receive bill inserts are not a captive audience. See *infra,* at 541–542. Four Justices dissented in *Lehman* on the ground that the municipality could not discriminate among advertisers. 418 U. S., at 308, 309 (BRENNAN, J., joined by STEWART, MARSHALL, and POWELL, JJ., dissenting).

[8] *Lehman* and *Greer* represent only one category of this Court's cases dealing with rights of access to governmental property. Compare *Tinker* v. *Des Moines School District,* 393 U. S. 503, 512–513 (1969), and *Hague* v. *CIO,* 307 U. S. 496, 515–516 (1939) (opinion of Roberts, J.), with *Adderley* v. *Florida,* 385 U. S. 39 (1966).

Commission as a forum from which to promulgate its views. Rather, it seeks merely to utilize its own billing envelopes to promulgate its views on controversial issues of public policy. The Commission asserts that the billing envelope, as a necessary adjunct to the operations of a public utility, is subject to the State's plenary control. To be sure, the State has a legitimate regulatory interest in controlling Consolidated Edison's activities, just as local governments always have been able to use their police powers in the public interest to regulate private behavior. See *New Orleans v. Dukes,* 427 U. S. 297, 303 (1976) *(per curiam).* But the Commission's attempt to restrict the free expression of a private party cannot be upheld by reliance upon precedent that rests on the special interests of a government in overseeing the use of its property.

## C

Where a government restricts the speech of a private person, the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest. See *First National Bank of Boston v. Bellotti,* 435 U. S., at 786; *Buckley v. Valeo,* 424 U. S. 1, 25 (1976) *(per curiam).* See also *Bates v. Little Rock,* 361 U. S. 516, 524 (1960).[9] The Commission argues finally that its prohibition is necessary (i) to avoid forcing Consolidated Edison's views on a captive audience, (ii) to allocate limited resources in the public interest, and (iii) to en-

---

[9] The Commission contends that its order should be judged under the standard of *United States v. O'Brien,* 391 U. S. 367, 377 (1968), because the order "is only secondarily concerned with the subject matter of Consolidated Edison communications. . . ." Brief for Appellee 9, n. 3. The *O'Brien* test applies to regulations that incidentally limit speech where "the governmental interest is unrelated to the suppression of free expression. . . ." 391 U. S., at 377. The bill insert prohibition does not further a governmental interest unrelated to the suppression of speech. Indeed, the court below justified the ban expressly on the basis that the speech might be harmful to consumers. 47 N. Y. 2d 94, 106–107, 390 N. E. 2d 749, 755 (1979).

sure that ratepayers do not subsidize the cost of the bill inserts.

The State Court of Appeals largely based its approval of the prohibition upon its conclusion that the bill inserts intruded upon individual privacy.[10] The court stated that the Commission could act to protect the privacy of the utility's customers because they have no choice whether to receive the insert and the views expressed in the insert may inflame their sensibilities. 47 N. Y. 2d, at 106–107, 390 N. E. 2d, at 755. But the Court of Appeals erred in its assessment of the seriousness of the intrusion.

Even if a short exposure to Consolidated Edison's views may offend the sensibilities of some consumers, the ability of government "to shut off discourse solely to protect others from hearing it [is] dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen* v. *California,* 403 U. S., at 21. A less stringent analysis would permit a government to slight the First Amendment's role "in affording the public access to discussion, debate, and the dissemination of information and ideas." *First National Bank of Boston* v. *Bellotti, supra,* at 783; see *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969); *Lamont* v. *Postmaster General,* 381 U. S. 301, 308 (1965) (BRENNAN, J., concurring). Where a single speaker communicates to many listeners, the First Amend-

---

[10] The State Court of Appeals also referred to the alternative means by which Consolidated Edison might promulgate its views on controversial issues of public policy. Although a time, place, and manner restriction cannot be upheld without examination of alternative avenues of communication open to potential speakers, see *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S., at 93, we have consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternative means of expression. See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S., at 757, n. 15; *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 556 (1975); *Spence* v. *Washington,* 418 U. S. 405, 411, n. 4 (1974) (*per curiam*).

ment does not permit the government to prohibit speech as intrusive unless the "captive" audience cannot avoid objectionable speech.

Passengers on public transportation, see *Lehman* v. *Shaker Heights,* 418 U. S., at 307–308 (Douglas, J., concurring in judgment), or residents of a neighborhood disturbed by the raucous broadcasts from a passing sound truck, cf. *Kovacs* v. *Cooper,* 336 U. S. 77 (1949), may well be unable to escape an unwanted message. But customers who encounter an objectionable billing insert may "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen* v. *California, supra,* at 21. See *Spence* v. *Washington,* 418 U. S. 405, 412 (1974) (*per curiam*). The customer of Consolidated Edison may escape exposure to objectionable material simply by transferring the bill insert from envelope to wastebasket.[11]

The Commission contends that because a billing envelope can accommodate only a limited amount of information, political messages should not be allowed to take the place of inserts that promote energy conservation or safety, or that remind consumers of their legal rights. The Commission relies upon *Red Lion Broadcasting Co.* v. *FCC, supra,* in which the Court held that the regulation of radio and television broadcast frequencies permits the Federal Government to exercise unusual authority over speech. But billing en-

---

[11] Although this Court has recognized the special privacy interests that attach to persons who seek seclusion within their own homes, see *Rowan* v. *Post Office Department,* 397 U. S. 728, 737 (1970), the arrival of a billing envelope is hardly as intrusive as the visit of a door-to-door solicitor. Yet the Court has rejected the contention that a municipality may ban door-to-door solicitors because they may invade the privacy of households. *Martin* v. *City of Struthers,* 319 U. S. 141, 146–147 (1943). Even if there were a compelling state interest in protecting consumers against overly intrusive bill inserts, it is possible that the State could achieve its goal simply by requiring Consolidated Edison to stop sending bill inserts to the homes of objecting customers. See *Rowan* v. *Post Office Department, supra.*

velopes differ from broadcast frequencies in two ways. First, a broadcaster communicates through use of a scarce, publicly owned resource. No person can broadcast without a license, whereas all persons are free to send correspondence to private homes through the mails. Thus, it cannot be said that billing envelopes are a limited resource comparable to the broadcast spectrum. Second, the Commission has not shown on the record before us that the presence of the bill inserts at issue would preclude the inclusion of other inserts that Consolidated Edison might be ordered lawfully to include in the billing envelope. Unlike radio or television stations broadcasting on a single frequency, multiple bill inserts will not result in a "cacophony of competing voices." *Id.*, at 376.

Finally, the Commission urges that its prohibition would prevent ratepayers from subsidizing the costs of policy-oriented bill inserts. But the Commission did not base its order on an inability to allocate costs between the shareholders of Consolidated Edison and the ratepayers. Rather, the Commission stated that "using bill inserts to proclaim a utility's viewpoint on controversial issues (*even when the stockholder pays for it in full*) is tantamount to taking advantage of a captive audience. . . ." App. to Juris. Statement 43a (emphasis added). Accordingly, there is no basis on this record to assume that the Commission could not exclude the cost of these bill inserts from the utility's rate base.[12] Mere speculation of harm does not constitute a compelling state interest. See *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217, 222–223 (1967).[13]

---

[12] In its denial of petitions for rehearing, the Commission re-emphasized that it would impose the ban without regard to allocation of costs between shareholders and ratepayers. App. to Juris. Statement 67a, n. 1.

[13] The Commission also contends that ratepayers cannot be forced to support the costs of Consolidated Edison's bill inserts. Because the Commission has failed to demonstrate that such costs could not be allocated between shareholders and ratepayers, we have no occasion to decide whether the rule of *Abood* v. *Detroit Board of Education*, 431 U. S. 209

## IV

The Commission's suppression of bill inserts that discuss controversial issues of public policy directly infringes the freedom of speech protected by the First and Fourteenth Amendments. The state action is neither a valid time, place, or manner restriction, nor a permissible subject-matter regulation, nor a narrowly drawn prohibition justified by a compelling state interest. Accordingly, the regulation is invalid. *First National Bank of Boston* v. *Bellotti,* 435 U. S., at 795.

The decision of the New York Court of Appeals is

*Reversed.*

MR. JUSTICE MARSHALL, concurring.

I join the Court's opinion. I write separately to emphasize that our decision today in no way addresses the question whether the Commission may exclude the costs of bill inserts from the rate base, nor does it intimate any view on the appropriateness of any allocation of such costs the Commission might choose to make. *Ante,* at 543. The Commission did not rely on the argument that the use of bill inserts required ratepayers to subsidize the dissemination of management's view in issuing its order, and we therefore are precluded from sustaining the order on that ground. Cf. *SEC* v. *Chenery Corp.,* 318 U. S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained"); *FPC* v. *Texaco Inc.,* 417 U. S. 380, 397 (1974); *FTC* v. *Sperry & Hutchinson Co.,* 405 U. S. 233, 249 (1972).

MR. JUSTICE STEVENS, concurring in the judgment.

Any student of history who has been reprimanded for talking about the World Series during a class discussion of the

---

(1977), would prevent Consolidated Edison from passing on to ratepayers the costs of bill inserts that discuss controversial issues of public policy.

First Amendment knows that it is incorrect to state that a "time, place, or manner restriction may not be based upon either the content or subject matter of speech." *Ante,* at 536. And every lawyer who has read our Rules,[1] or our cases upholding various restrictions on speech with specific reference to subject matter[2] must recognize the hyperbole in the dictum: "But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 95, quoted in part, *ante,* at 537. Indeed, if that were the law, there would be no need for the Court's detailed rejection of the justifications put forward by the State for the restriction involved in this case. See *ante,* Part III–C.

There are, in fact, many situations in which the subject matter, or, indeed, even the point of view of the speaker, may provide a justification for a time, place, and manner regulation. Perhaps the most obvious example is the regulation of oral argument in this Court; the appellant's lawyer precedes his

---

[1] This Court's Rules 15, 16, 21, 22, 33, 34, 36 (effective June 30, 1980).

[2] See, *e. g., NLRB* v. *Retail Store Employees, post,* p. 607 (labor picketing at site of neutral third parties in labor dispute); *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447 (in-person solicitation of legal business, distinguished from other forms of legal advertising); *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (indecent language in early afternoon radio broadcast); *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (zoning of "adult" movie theaters); *Greer* v. *Spock,* 424 U. S. 828 (partisan political speeches on military base); *Lehman* v. *Shaker Heights,* 418 U. S. 298 (political advertising on municipal transit system); *Schenck* v. *United States,* 249 U. S. 47, 52 (Holmes, J.): "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." See also cases cited in *American Mini Theatres, supra,* at 67–71.

See generally Farber, Content Regulation and the First Amendment: A Revisionist View, 68 Geo. L. J. 727 (1980); Note, *Pacifica Foundation v. FCC:* "Filthy Words," the First Amendment and the Broadcast Media, 78 Colum. L. Rev. 164 (1978).

adversary solely because he seeks reversal of a judgment.[3] As is true of many other aspects of liberty, some forms of orderly regulation actually promote freedom more than would a state of total anarchy.[4]

Instead of trying to justify our conclusion by reasoning from honeycombed premises, I prefer to identify the basis of decision in more simple terms. See *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 65–66. A regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a "law . . . abridging the freedom of speech, or of the press."[5] A regulation that denies one group of persons the right to address a selected audience on "controversial issues of public policy" is plainly such a regulation.

The only justification for the regulation relied on by the New York Court of Appeals is that the utilities' bill inserts may be "offensive" to some of their customers.[6] But a com-

---

[3] This Court's Rule 38.2. For the same reason, the color of his brief must be blue rather than red. Rule 33.2 (b) (3).

[4] "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *Cox* v. *New Hampshire*, 312 U. S. 569, 574.

Cf. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 375; *Cox* v. *Louisiana*, 379 U. S. 536, 554.

[5] The First Amendment provides:

"Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ."

In a series of decisions beginning with *Gitlow* v. *New York*, 268 U. S. 652, this Court held that the liberty of speech and of the press which the First Amendment guarantees against abridgment by the Federal Government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action. See *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 500, n. 8.

[6] "When the insert espouses the utility's viewpoint on a controversial question, it is as likely to offend the sensibilities of the recipient as it is to elicit agreement. Government need not stand idly by and deny assistance

munication may be offensive in two different ways. Independently of the message the speaker intends to convey, the form of his communication may be offensive—perhaps because it is too loud [7] or too ugly in a particular setting.[8] Other

to those who are inflamed by having a particular opinion foisted upon them." 47 N. Y. 2d 94, 106, 390 N. E. 2d 749, 755 (1979).

[7] *Kovacs* v. *Cooper,* 336 U. S. 77. See *id.,* at 97 (Frankfurter, J., concurring):

"So long as a legislature does not prescribe what ideas may be noisily expressed and what may not be, nor discriminate among those who would make inroads upon the public peace, it is not for us to supervise the limits the legislature may impose in safeguarding the steadily narrowing opportunities for serenity and reflection. Without such opportunities freedom of thought becomes a mocking phrase, and without freedom of thought there can be no free society."

In his dissenting opinion, Mr. Justice Rutledge, referring to sound trucks in public places, stated that he had "no doubt of state power to regulate their abuse in reasonable accommodation, by narrowly drawn statutes, to other interests concerned in use of the streets and in freedom from public nuisance." *Id.,* at 105.

[8] See *FCC* v. *Pacifica Foundation, supra,* at 745–746 (opinion of STEVENS, J.):

"The question in this case is whether a broadcast of patently offensive words dealing with sex and excretion may be regulated because of its content. Obscene materials have been denied the protection of the First Amendment because their content is so offensive to contemporary moral standards. *Roth* v. *United States,* 354 U. S. 476. But the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas. If there were any reason to believe that the Commission's characterization of the Carlin monologue as offensive could be traced to its political content—or even to the fact that it satirized contemporary attitudes about four-letter words—First Amendment protection might be required. But that is simply not this case. These words offend for the same reasons that obscenity offends. Their place in the hierarchy of First Amendment values was aptly sketched by Mr. Justice Murphy when he said: '[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step

speeches, even though elegantly phrased in dulcet tones, are offensive simply because the listener disagrees with the speaker's message. The fact that the offensive form of some communication may subject it to appropriate regulation surely does not support the conclusion that the offensive character of an idea can justify an attempt to censor its expression. Since the Public Service Commission has candidly put forward this impermissible justification for its censorial regulation, it plainly violates the First Amendment.[9]

Accordingly, I concur in the judgment of the Court.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE REHNQUIST as to Parts I and II joins, dissenting.

My dissent in this case in no way indicates any disapprobation on my part of the precious rights of free speech (so

---

to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *Chaplinsky* v. *New Hampshire,* 315 U. S., at 572." (Footnotes omitted.)

See also *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 84 (BRENNAN, J., dissenting): "[T]he obscenity of any particular item may depend upon nuances of presentation and the context of its dissemination. . . . *Redrup* [v. *New York,* 386 U. S. 767,] itself suggested that obtrusive exposure to unwilling individuals, distribution to juveniles, and 'pandering' may also bear upon the determination of obscenity."

[9] I recognize that in this Court the Commission has also tried to defend its regulation on the ground that it is entitled to allocate limited resources in the public interest and to guarantee that ratepayers do not subsidize these communicative activities. I agree with the Court's explanation of why there is no merit to either of these suggestions. See *ante,* at 542–543.

Even viewing the restriction as merely a neutral subject-matter regulation (controversial issues generally) as may have been intended initially by the Commission, rather than a restriction of a particular viewpoint (the utilities' opinions on those issues), I still believe it to be unconstitutional. For the use of the "controversial" nature of speech as the touchstone for its regulation threatens a value at the very core of the First Amendment, the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270.

carefully cataloged by the Court in its opinion) that are protected by the First and Fourteenth Amendments against repression by the State. My prior writings for the Court in the speech area prove conclusively my sensitivity about these rights and my concern for them. See, *e. g., Bigelow* v. *Virginia,* 421 U. S. 809 (1975); *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748 (1976); *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977). See also *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n, post,* p. 573 (opinion concurring in judgment).

But I cannot agree with the Court that the New York Public Service Commission's ban on the utility bill insert somehow deprives the utility of its First and Fourteenth Amendment rights. Because of Consolidated Edison's monopoly status and its rate structure, the use of the insert amounts to an exaction from the utility's customers by way of forced aid for the utility's speech. And, contrary to the Court's suggestion, an allocation of the insert's cost between the utility's shareholders and the ratepayers would not eliminate this coerced subsidy.

I

A public utility is a state-created monopoly. See, *e. g.,* N. Y. Pub. Serv. Law § 68 (McKinney 1955); Jones, Origins of the Certificate of Public Convenience and Necessity; Developments in the States 1870–1920, 79 Colum. L. Rev. 426, 458–461 (1979); Comment, Utility Rates, Consumers, and the New York State Public Service Commission, 39 Albany L. Rev. 707, 709–714 (1975). Although monopolies generally are against the public policies of the United States and of the State of New York, see, *e. g.,* N. Y. Gen. Bus. Law § 340 (McKinney 1968 and Supp. 1979–1980), Consolidated Edison and other utilities are permitted to operate as monopolies because of a determination by the State that the public interest is better served by protecting them from competition. See 2 A. Kahn, The Economics of Regulation 113–171 (1971).

This exceptional grant of power to private enterprises justifies extensive oversight on the part of the State to protect the ratepayers from exploitation of the monopoly power through excessive rates and other forms of overreaching. For this reason, the State regulates the rates that utilities may charge. See N. Y. Pub. Serv. Law § 66 (12) (McKinney Supp. 1979–1980). In addition, New York law gives its Public Service Commission plenary supervisory powers over all property, real and personal, "used or to be used for or in connection with or to facilitate the . . . sale or furnishing of electricity for light, heat or power." N. Y. Pub. Serv. Law §§ 2 (12) and 66 (1) (McKinney 1955). State law explicitly gives the Commission control over the format of the utility bill and any material included in the envelope with the bill. § 66 (12–a) (McKinney Supp. 1979–1980).

The rates authorized by the Public Service Commission may reflect only the costs of providing necessary services to customers plus a reasonable rate of return to the utility's shareholders. See, e. g., Comment, 39 Albany L. Rev., at 719–723. The entire bill payment system—meters, meter-reading, bill mailings, and bill inserts—are paid for by the customers under Commission rules permitting recovery of necessary operating expenses. Uniform System of Accounts—Expense Accounts—Customer Account Expenses, 16 N. Y. C. R. R. §§ 901–906 (1974). Under the laws of New York and other States, however, a public utility cannot include in the rate base the costs of political advertising and lobbying. See, e. g., Uniform System of Accounts, Account 426.4, Expenditures for Certain Civic, Political and Related Activities, 16 N. Y. C. R. R., ch. II, subch. F (1976); *Southern Bell Tel. & Tel. Co.* v. *Louisiana Pub. Serv. Comm'n,* 239 La. 175, 207–209, 118 So. 2d 372, 384 (1960); *Southwestern Bell Tel. Co.,* 19 P. U. R. 4th 1, 28–29 (Kan. Corp. Comm'n 1977); *Boushey* v. *Pacific Gas & Elec. Co.,* 10 P. U. R. 4th 23 (Cal. Pub. Util. Comm'n 1975) (banning controversial bill inserts); *Cascade Natural Gas Corp.,* 8 P. U. R. 4th

19, 27 (Ore. Pub. Util. Comm'n 1974); *Pacific Power & Light Co.*, 34 P. U. R. 3d 36, 46–47 (Ore. Pub. Util. Comm'n 1960); *Southwestern Bell Tel. Co.*, 77 P. U. R. (n. s.) 33, 42 (Mo. Pub. Serv. Comm'n 1949); *In re Investigation into the Advertising and Promotional Practices of Regulated Iowa Pub. Utils.*, No. U–463 (Iowa State Commerce Comm'n Jan. 29, 1975). These costs cannot be passed on to consumers because ratepayers derive no service-related benefits from political advertisements. The purpose of such advertising and lobbying is to benefit the utility's shareholders, and its cost must be deducted from profits otherwise available for the shareholders. The Federal Energy Regulatory Commission, formerly the Federal Power Commission, has adopted this rule as well. *Alabama Power Co.*, 24 F. P. C. 278, 286–287 (1960), aff'd *sub nom. Southwestern Electric Power Co. v. Federal Power Comm'n*, 304 F. 2d 29 (CA5), cert. denied, 371 U. S. 924 (1962); Federal Energy Regulatory Commission, Uniform System of Accounts, Account 426.4, 18 CFR Part 101, p. 383 (1979).

## II

The Commission concluded, properly in my view, that use of the billing envelope to distribute management's pamphlets amounts to a forced subsidy of the utility's speech by the ratepayers.[1] Consolidated Edison would counter this argu-

---

[1] MR. JUSTICE MARSHALL, in his concurring opinion, states: "The Commission did not rely on the argument that the use of bill inserts required ratepayers to subsidize the dissemination of management's view in issuing its order, and we therefore are precluded from sustaining the order on that ground." *Ante*, at 544.

I cannot agree that the Commission did not rely on the "forced subsidy" justification. In its opinion denying petitions for rehearing, the Commission stated:

"We note also that where the ratepayer's bill is accompanied by political advertisement, the political material is, absent allocation, getting a free ride; the utility is deriving the economic benefit of postage, envelope, labor and overhead involved in the billing process. And even if an allocation of the expenses could be made, the actual cost of enclosing such material

ment by pointing out that it is willing to allocate to share-holders the *additional* costs attributable to the inserts. It maintains: "The fact that the utilities may incidentally save money by the use of bill inserts, at no expense to the rate-payers, is not detrimental to the ratepayers or the public." Brief for Appellant 21.

I do not accept appellant's argument that preventing a "free ride" for the utility's message is not a substantial, legit-imate state concern. Even though the free ride may cost the ratepayers nothing additional by way of specific dollars, it still qualifies as forced support of the utility's speech. See, *e. g., Boushey* v. *Pacific Gas & Elec. Co.,* 10 P. U. R. 4th, at 27; Note, Utility Companies and the First Amendment: Reg-ulating the Use of Political Inserts in Utility Bills, 64 Va. L. Rev. 921, 926 (1978). If the State compelled an individual to help defray the utility's speech expenses, that compul-sion surely would violate that person's First and Fourteenth Amendment rights. *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 233–235 (1977); *id.,* at 256 (POWELL, J., con-curring in judgment). The fact that providing such aid costs the individual nothing extra does not make the compulsion any less offensive. See *Wooley* v. *Maynard,* 430 U. S. 705, 714–715 (1977); *Buckley* v. *Valeo,* 424 U. S. 1, 22–23, 36 (1976) (recognizing that permitting a candidate to use real or personal property provides material financial assistance to the candidate); *id.,* at 91, n. 124.[2] For example, a state law re-

---

in the bill itself does not approach the one-sided benefit to the management of being able to use the unique billing process in presenting its side of the controversy. It is certainly questionable whether ratepayers should be compelled to support views with which they do not agree. See *Abood* v. *Detroit Board of Education,* [431 U. S. 209] (1977)." App. to Juris. Statement 67a, n. 1.

[2] *PruneYard Shopping Center* v. *Robins, ante,* p. 74, does not impinge upon this general principle. The decision there was based on the fact that the shopping center voluntarily chose to open its grounds to the public and therefore the State could require that the center permit the exercise of speech rights on the property.

quiring a person to permit the utility to include its insert in the envelope with that person's private letters clearly would infringe upon the letterwriter's First and Fourteenth Amendment rights.

Of course, a private business does not deprive an individual of his constitutional rights unless state action is involved. Although the State has given utilities their monopoly power and thus contributed to a situation in which coerced support of the utility's speech is possible, the state-action requirement of the Fourteenth Amendment may not be met in this situation. See *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974).

I do not find it necessary, however, to decide whether state action in the Fourteenth Amendment sense has occurred here. It is not necessary to decide whether the ratepayers' First and Fourteenth Amendment rights have been infringed in order to determine whether the State has the power to prevent the utility from exacting aid from the ratepayers in dissemination of a message with which they do not all agree. Even if the State is not so entwined in the activities of Consolidated Edison to meet the state-action requirement, the State has made a monopoly possible by preventing others from competing with the utility. Thus the State is legitimately concerned with preventing the utility from taking advantage of this monopoly power to force consumers to subsidize dissemination of its viewpoint on political issues.[3]

---

[3] An example makes this point clear. States authorize the creation of trusts, and the costs of administering a trust are charged to the trust estate. If the trustee, for example a bank, finds it necessary to communicate with the beneficiaries of the trust by letter concerning investments, income distribution, and the like, the expenses of that mailing ordinarily are proper administrative costs to be borne by the trust. In the trust situation, it would seem to be entirely permissible for the State to prohibit the trustee from including in such a mailing its own political insert on a matter unrelated to the trust. Even though adding the bank's insert may cost the beneficiaries nothing, assuming that the bank pays for the printing and stuffing of the insert, the State has an interest in

554

In suggesting that the State's interest in eliminating forced subsidization of the utility's speech can be achieved by allocating the expenses of the inserts to the utility's shareholders, the Court has glossed over the difficult allocation issue underlying this controversy. It is not clear to me from the Court's opinion whether it believes that charging the shareholders with the marginal costs associated with the inserts, that is, the costs of printing and putting them into the envelope, will satisfy the State's interest, or whether the Court is suggesting some division of the fixed costs of the mailing, that is, the postage, the envelope, the creation and maintenance of the mailing list, and any other overhead expense. See *ante,* at 543.

The Commission maintains that no allocation short of charging all the fixed costs of mailing the bills to the utility's shareholders will eliminate the problem of forced subsidization of the utility's speech. The Commission is obviously correct that the utility will obtain a partial free ride for its message even if the shareholders are charged with part of the mailing costs in addition to the costs directly attributable to the inserts. Consumers would still be forced to aid in the dissemination of the utility's message by making the utility's distribution costs less than they otherwise would be.

Charging all the mailing costs to the shareholders is equivalent, as a practical matter, to the Commission's ban on political inserts. The utility wants to use the inserts only because they are less expensive than a separate mailing.[4] Thus, there

---

assuring that the trustee does not derive personal benefit from its role as trustee. The trustee has no constitutional right to a free ride for its message. Here, the state interest in preventing a utility from obtaining a free ride is even stronger, since utility customers have no choice but to purchase electricity from Consolidated Edison, while trusts are voluntarily created and the trustee is chosen by the trustor.

[4] Due to the greater likelihood that a recipient would read an insert with the bill, the utility well might desire to place its insert with the bill even if the total cost of the mailing were charged to the shareholders. See *Long Island Lighting Co.* v. *New York State Public Service Comm'n,*

is no way for the State to achieve its important goal—protecting the ratepayers from forced support of ideas with which they disagree—that is less restrictive than a total ban.

Because ratepayers bear the cost of this medium of communication, the utility's claim to use the bill envelope for its own purposes is not analogous to that of a private letter-writer, or of a nonmonopolistic business, whose customers can turn elsewhere if they object to inserts in their bills that their sales dollars help to finance. Cf. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 794, n. 34 (1978). This, therefore, is not a typical prohibition of a speaker's attempt "merely to utilize its own [property] to promulgate its views." *Ante*, at 540. Rather, this is an attempt by the utility to appropriate and make convenient use of property, for which the public is compelled to pay, for the utility's sole benefit. The Commission's ban on bill inserts does not restrict the utility from using the shareholders' resources to finance communication of its viewpoints on any topic. Consolidated Edison is completely free to use the mails and any other medium of communication on the same basis as any other speaker. The order merely prevents the utility from relying on a forced subsidy from the ratepayers. This leads me to conclude that the State's attempt here to protect the ratepayers from unwillingly financing the utility's speech and to preserve the billing envelope for the sole benefit of the customers who pay for it does not infringe upon the First and Fourteenth Amendment rights of the utility.

## III

I might observe, additionally, that I am hopeful that the Court's decision in this case has not completely tied a State's

---

No. 77 C 972 (EDNY, Mar. 30, 1979), reproduced in App. to Brief for Long Island Lighting Company as *Amicus Curiae* 1a. This, however, is just another type of forced aid for the utility's message that cannot be eliminated except by a total ban on bill inserts.

hands in preventing this type of abuse of monopoly power. The Court's opinion appears to turn on the particular facts of this case, and slight differences in approach might permit a State to achieve its proper goals.

First, it appears that New York and other States might use their power to define property rights so that the billing envelope is the property of the ratepayers and not of the utility's shareholders. Cf. *PruneYard Shopping Center* v. *Robins, ante,* p. 74. Since it is the ratepayers who pay for the billing packet, I doubt that the Court would find a law establishing their ownership of the packet violative of either the Takings Clause or the First and Fourteenth Amendments. If, under state law, the envelope belongs to the customers, I do not see how restricting the utility from using it could possibly be held to deprive the utility of its rights.

Second, the opinion leaves open the issue of cost allocation. The Commission could charge the utility's shareholders all the costs of the envelopes and postage and of creating and maintaining the mailing list, and charge the consumers only the cost of printing and inserting the bill and the consumer service insert. See *Long Island Lighting Co.* v. *New York State Public Service Comm'n,* No. 77 C 972 (EDNY, Mar. 30, 1979), reproduced in App. to Brief for Long Island Lighting Company as *Amicus Curiae* 22a. There is no reason that the shareholders should be given a free ride for their pamphlets, rather than the customers be given a free ride for their bills. Such an allocation would eliminate the most offensive aspects of the forced subsidization of the utility's speech. But see n. 3, *supra.*

Because I agree with the Appellate Division of the New York Supreme Court, that "[i]n the battle of ideas, the utilities are not entitled to require the consumers to help defray their expenses," 63 App. Div. 2d 364, 368, 407 N. Y. S 2d 735, 737 (1978), I respectfully dissent.