Fuchsberg, J.
(dissenting). The petition of the Grievance Committee, respondent on this appeal, should be dismissed.
Whatever the prescriptions of professional “etiquette” *130 and institutional preferences may have been in the past, the Supreme Court, final arbiter of First Amendment issues, has declared that the constitutional protection accorded commercial speech will no longer abide unreasonable restrictions on the advertising of information calculated to serve “individual and societal interests' in assuring informed and reliable decisionmaking” concerning the price and availability of at least “routine legal services” (Bates v State Bar of Ariz., 433 US 350, 364, 384; Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748).[1] Essentially on this basis, in Matter of Koffler, sweeping aside the Appellate Division’s “artificial distinction between solicitation and advertising”, and undeterred by section 479 of our Judiciary Law,[2] we upheld a lawyer’s mail solicitation of potential clients (51 NY2d 140, 143). Now, abandoning this high road, the majority, hypothesizing excesses and ignoring less restrictive means by which these may be avoided, upholds a total ban on a lawyer’s mailings to realtors. In my view, on the analysis which follows, this absolute prohibition must be regarded as so unreasonable a restraint on communication as to constitute an abridgment of First Amendment rights.
Preliminarily, to move most quickly to the heart of the matter, it may be well to point to three considerations with which the majority perforce has had to agree. One is that the Code of Professional Responsibility is subordinate to the provisions of section 479 of the Judiciary Law and that this statute, in turn, must defer to our Constitutions, State and Federal. A second is that, since Bates, lawyer advertising, though it “implicitly or explicitly involves solicitation”, may no longer be proscribed per se (Koffler, supra, at p 146); rather, in Koffler, in the course of upholding the validity of direct mail advertising of the nature and price of *131 legal services offered to homeowners as prospective clients, we recognized the validity of this postulate.[3] A third, this time factual, is that the contents of the appellant Alan I. Greene’s fliers were not false, deceptive or misleading in any way.
These noted, we express disagreement, with the majority’s reading of Ohralik v Ohio State Bar Assn. (436 US 447) as an out-and-out “condemnation” of all in-person solicitation (p 122). True, it held that a State Bar could constitutionally discipline a lawyer for soliciting clients “in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent” (Ohralik, supra, at p 449). It is a mistake, however, to assume from this general language that the limitation was a wide-ranging one. For Ohralik’s words are self-limiting and, significantly, were uttered in the context of a congerie of facts surrounding an extreme episode of oppressive and overreaching importuning of the hospitalized victim of an accident. That the court intended no blunderbuss declaration ruling out all direct solicitation, whether essayed in person or by mail, becomes apparent too from its concurrent determination in Matter of Primus (436 US 412). Handed down with Ohralik, Primus held a solicitation letter dispatched by an attorney employed by the American Civil Liberties Union sheltered by the First Amendment. So deciding, the court did more than comment that the ACLU litigates both “as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public” (Primus, supra, at p 431). It also made the point, relevant here, that, if anything, “the fact that there was a written communication lessens substantially the difficulty of policing solicitation practices that do offend valid rules of professional conduct” (Primus, supra, at pp 435-436).
In Koffler, we emphasized that interdiction of letters addressed to potential clients would cut across the “strong *132 societal and individual interest in the free dissemination of truthful price information * * * in our free enterprise system” (Koffler, supra, at p 146).[4] Oddly, the majority now recoils from this reasoning when letters are addressed to real estate brokers whom, after all, buyers or sellers of real property conceivably may be expected to consult on the choice of a lawyer. Absent any record data, empirical or otherwise, to warrant this departure from the spirit of our earlier declaration, it offers no more than direful speculation, which, I respectfully suggest, reflects perhaps unconscious, but nevertheless impermissible, obeisance to the tastes and traditions of a pre-Bates yesteryear. (See Kentucky Bar Assn, v Stuart, 568 SW2d 933 [Ky], supra [letters to real estate agencies merely stating the price of routine legal services and the qualifications of the attorneys not in-person solicitation].)
It cannot be gainsaid that a mailing to third parties contemplates interaction between their recipients and potential clients.[5] But, in principle, what Greene sought by resort to this more targeted, and presumably more cost-efficient, mail medium was simply to heighten the chances that the concededly fair and truthful message he wished to convey would come to the attention of those to whom it would be most useful, a perfectly sensible and acceptable, even “indispensable”, objective (Bates, supra, at p 364).[6]
Needless to say, any referral system is highly dependent upon the availability of information about an attorney. *133 Moreover, a paramount reason for the Supreme Court’s support of a lawyer’s right to advertise was its recognition that, in a time when mobility and urbanization had become an integral part of our social climate, pre-Baies referral practices, attuned as they were to the far more fixed fashions of an essentially “small-town society”, in which “reputational information” could be expected to be common knowledge, no longer was adequate (Bates, supra, at pp 374-375, n 30; see Cheatham, Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar, 12 UCLA L Rev 438, 440; Meserve, Our Forgotten Client: The Average American, 57 ABA J 1092; cf. Zaldin v Concord Hotel, 48 NY2d 107, 112).
Consequently, I find it difficult to understand how the majority, in face of our prior acceptance of the right to advertise by direct mail, can equate Greene’s restrained use of that medium with the vexatious in-person solicitation at which Ohralik strikes (see p 128). For, at its worst, Greene’s conduct, even if we were to disregard its salutary candor and written form, cannot be said to have differed in spirit and intent, for instance, from the exposure to potential clients and potential recommenders that many lawyers, with full propriety, attempt to achieve by carefully structuring their social and community associations (see Bates, supra, at p 371).[7] Nor can it be said that Greene’s mode of communication suffers by comparison, in morality or accountability, with the far more amorphous collection of contacts with the coterie of friends, relatives, business or social acquaintances and former clients who-constitute the main source to which most lawyers engaged in private practice look for referrals.
Surely, whether a third party’s recommendation of a lawyer to a consumer of legal services has been generated by personal cultivation of or a chance acquaintance with the recommender or whether the recommender’s awareness of the lawyer’s availability stemmed from the lawyer’s cor *134 rect employment of contemporary mail or media channels, common sense teaches that there is no basis for attributing greater risks of the occasional unprofessionalism or over-commercialization, which in this imperfect world will at times occur in any quarter, to the latter rather than the former. Little wonder then that the Supreme Court has dubbed arguments which focus on fears of this character too “dubious” to survive constitutional scrutiny (see Bates, supra, at pp 369-379).
Specifically, to recite them verbatim, the suppositions on which alone we are asked to conclude that the demons of conflict of interest will be let loose are that “the lawyer’s view of marketability of title may be colored by his knowledge that the referring broker normally will receive no commission unless title closes” or that the lawyer will not make efforts to “negotiate to the lowest possible level the commission to be paid to the broker” or that “the lawyer will not examine with the same independence that he otherwise would the puffery that the broker has indulged in to bring about the sale” at p 129).[8] But, even if these cynical conjectures reflected anything more than occasional vagaries, it would be outlandish for the fears the committee entertains to form the predicate for punishing facially innocent mail communications with brokers while ignoring the fact that, if the fears were founded, they would be at least as pertinent to lawyers who, enjoying personal or professional relationships with brokers, are far, far, more likely to become the beneficiaries of such referrals and the inheritors of the hobgoblins of client betrayal which, so unaccountably and so *135 unevenly, appear to concern the committee.[9] Artificial distinctions of this sort are not only indefensible, but are just the sort of things which unwarrantedly sap public confidence in the legal system.
The nature of Greene’s alleged assault on the ethical standards now seen in fuller perspective, we proceed to match the mailing of his fliers against the criteria so lately set out by the United States Supreme Court in Central Hudson Gas v Public Serv. Comm. (447 US 557, 564-566). Reiterating the court’s position that commercial speech is subject to a State’s reasonable time, place and manner regulation (Consolidated Edison v Public Serv. Comm., 447 US 530, 536), that case erected a four-part analysis for testing whether a particular State regulation goes too far.
Applying the test, initially we must say whether the speech in question is misleading or related to an unlawful activity, for then it is entitled to no protection. This hurdle it easily overcomes. As indicated earlier, it is agreed that the speech here did not offend either requirement.
Secondly, we must-decide whether the regulation generally is in furtherance of a substantial State interest. This too need not detain us. Since the possibility of deceptive or unethical conduct always exists in the abstract at least, a legitimate State interest may be said to exist.
This brings us to the third level of inquiry, i.e., evaluation of “the directness of relation of regulation to purpose” (Matter Koffler, 51 NY2d 140, 148, supra). For the reasons more fully detailed above, the regulation here did not measure up. Greene’s mailings involved no professional trespass. Not all lawyer mailings invite the ethical departures the committee envisaged. Such departures certainly are not the inevitable result of all direct mail advertising. The one before us only concerned information about price and availability and, as such, was in accord with Ethical Consideration 2-8 of the Code of Professional Responsibility of the American Bar Association (see, also, New York’s *136 Code of Professional Responsibility EC 2-8 in McKinney’s Cons Laws of NY, Book 29, § 500 to end, pocket part [1980-1981], p 45). Disseminating this information serves a useful rather than a harmful individual and societal function. The Supreme Court has “declined to uphold regulations that only indirectly advance the state interest involved” (Central Hudson Gas v Public Serv. Comm., 447 US 557, 564, supra). The regulation here, therefore, was unreasonable, and, consequently, must fall on that account.
Finally, we determine whether less restrictive measures were available to the State. For the regulatory technique may not be disproportionate to the interest served. Obviously, since the communication here was not a transitory oral one, but made by mail, a filing requirement or one that calls for an appropriate disclaimer might have been an available and practical alternative (see Bates, supra, at p 384; Koffler, supra, at p 150; Kentucky Bar Assn. v Stuart, supra, at p 934; ABA Proposed Draft of Model Rules of Professional Conduct, rule 7.2, subd [b], and Comment).[10] Yet, the committee offered no adequate explanation for failing to engage these or other lesser methods by which to assure that the regulatory scheme was not more extensive than necessary to serve the governmental interest at stake. Instead, imposing an unwarranted absolute prohibition, it chose a means unreasonably and insufficiently related to the purpose to be served.
It follows that the order of the Appellate Division should be reversed and the petition dismissed.
Judges Jasen, Gabrielli, Jones and Wachtler concur with Judge Meyer; Judge Fuchsberg dissents and votes to reverse in an separate opinion in which Chief Judge Cooke concurs.
Order affirmed.

. “[S]uch speech should not be withdrawn from protection merely because it proposed a mundane commercial transaction * * * The listener’s interest is substantial: the consumer’s concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue” (Bates, supra, at pp 363-364; cf. Fuchsberg, Commercial Speech: Where It’s At, 46 Brooklyn L Rev 389, 391).

. Section 479 of the Judiciary Law, effective September 1, 1967, anteceded Bates by 10 years and has not been amended in the intervening years.

. Earlier, a similar conclusion was reached by the New York State Bar Association Committee on Professional Ethics in its opinion No. 507: “[I]t seems clear to us in this era of direct-mail advertising that an advertisement * ** * does not become an improper solicitation merely because it is placed in the recipient’s mail box by a postman rather than a newsboy”.

. (See, generally, Kentucky Bar Assn, v Stuart, 568 SW2d 933 [Ky] ; Bishop v Committee on Professional Ethics & Conduct of Iowa State Bar Assn., 521 F Supp 1219; Andrews, Birth of A Salesman: Lawyer Advertising and Solicitation 61-68; Brosnahan and Andrews, Regulation of Attorney Advertising: In the Public Interest?, 46 Brooklyn L Rev 423; Comment, Three Years Later: State Court Interpretation of the Attorney’s Right to Advertise and the Public’s Right to Information, 45 Mo L Rev 562.)

. Koffler’s recognition of this characteristic (supra, at p 145, n 2) did not suggest a preordained result (compare our footnote with footnote 25 in Virginia Pharmacy, 425 US 748, 773, supra, and the Supreme Court’s ensuing holding in Bates).

. Greene’s fliers were mailed to all brokers in a circumscribed area — Westchester County, where he resided and practiced, and portions of adjoining Putnam County. It was no more than logical for him to reason that an untargeted mailing to the adult members of a population of well over a million would not only have been wasteful but prohibitively expensive.

. The venerability of referrals as a source of clients has been recognized also in Ohralik (supra, at p 465, n 24); the New York Code of Professional Responsibility (EC2-8); and the American Bar Association’s Proposed Draft of Model Rules of Professional Conduct (rule 7.2, subd [c]).

. In the same vein, the Grievance Committee, to justify its condemnation of the attorney, goes so far as to find cause for complaint in the argument that the respondent, whose fliers did not indicate the slightest inclination to split fees, would also “deceive the realtor, who will believe if a person is referred to the attorney, he, the realtor, will obtain something in return for the referral, when in fact he will not”. To this, of course, the short answer is that frustration of any real estate agent (or any other referrer of a client) who may entertain such an expectation would be a testimonial to the unswerving probity and ethics of the lawyer, who in any event, is held to DR 2-103 (B), which specifically states: “A lawyer shall not compensate or give anything of value to a person * * * as a reward for having made a recommendation resulting in employment by a client”. It may not be remiss to add that even the realtors seem to be too freely belabored, since the record establishes that none of the recipients of the defendant’s flier responded at all, much less improperly.

. Since, from the record here, mail communications may not be very productive of referrals, the fears may be academic as well as groundless. Greene received no referrals in response to his flier. The four amici, from another part of the State, fared no better.

. This is not intended as an indorsement of the procedures mentioned, either in isolation or in preference to other methods. Rather, mention is made of these measures merely to demonstrate that less restrictive regulatory means are available or can be developed.