## LEAGUE OF WOMEN VOTERS OF CALIFORNIA, et al., Plaintiffs,
### v.
## FEDERAL COMMUNICATIONS COMMISSION, Defendant.
### No. CV–79–1562–MML.

United States District Court,
C. D. California.

Aug. 5, 1982.

Center for Law in the Public Interest by Frederic D. Woocher, Lucas Guttentag, John R. Phillips, Los Angeles, Cal., for plaintiffs.

U. S. Atty. by Stephen S. Trott, Stephen D. Petersen, Asst. U. S. Atty., Los Angeles, Cal., J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice by Paul Blankenstein, Judith F. Ledbetter, Washington D. C., for defendant.

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS

LUCAS, District Judge.

This action presents a constitutional challenge to that portion of 47 U.S.C.A. § 399 (West Supp. 1982) ("§ 399") which prohibits certain noncommercial educational television and radio stations [1] from editorializing in their broadcasts. Before turning to the issues raised by this challenge it will be useful to set out the rather complex history of this litigation.

A milestone in the history of public broadcasting in the United States was reached with the enactment of the Public Broadcasting Act of 1967, Pub. L. No. 90–129, 81 Stat. 368 (1967) (codified at 47 U.S.C. §§ 390 *et seq.*) The Act provided federal financial assistance for public broadcasting and established a non-profit, private corporation, the Corporation for Public Broadcasting ("CPB"), to oversee distribution of this funding and to assist and encourage the development of public television and radio stations in the United States. The Public Broadcasting Act also contained a provision prohibiting all public broadcasting stations from editorializing and from supporting or opposing any candi-

---

1. Such stations are also known as "public" broadcasting stations. The Court will use the terms "noncommercial educational" and "public" interchangeably.

date for political office. This provision was codified at 47 U.S.C. § 399.[2]

The instant suit, challenging the constitutionality of § 399, was filed on April 30, 1979 against the Federal Communications Commission ("FCC"). Plaintiffs argued that prohibiting all public television and radio stations from editorializing and from supporting or opposing any political candidates violated both the First Amendment's guarantee of free speech and the Equal Protection Guarantee embodied in the Due Process Clause of the Fifth Amendment. Because this challenge presented primarily legal issues rather than factual disputes, plaintiffs were able to move for summary judgment several months after filing the complaint.

Rather than file opposition papers to this motion, the United States Department of Justice, acting as attorney for defendant, notified the Court that it would not defend the constitutionality of § 399. Plaintiffs' motion for summary judgment was continued by stipulation to enable defendant to present the matter to Congress so that it could consider the matter and take whatever action within its power it deemed proper.

On January 17, 1980 the Senate Legal Counsel, acting on behalf of the United States Senate, moved for leave to appear as *amicus curiae* in this action.[3] On that same date, the Senate also noticed a motion to dismiss the complaint on the alternate grounds that this action did not present a ripe case or controversy between adverse parties and that plaintiffs had failed to exhaust mandatory administrative procedures. Plaintiffs subsequently moved to disallow the filing of the Senate's motion to dismiss. Concurrent briefing schedules were established for these two motions as well as for the Senate's motion to appear as *amicus curiae* and oral argument of all three of the motions was heard on March 3, 1981. On March 10, 1981 the Court granted the Senate's motion for leave to appear as *amicus curiae* and denied plaintiffs' motion to disallow the filing of the Senate's motion to dismiss. The Court then granted the Senate's motion to dismiss. *League of Women Voters of California v. FCC,* 489 F.Supp. 517 (C.D.Cal.1980). In ordering the dismissal of the action, the Court held that, in light of evidence that the FCC would not enforce § 399 and the refusal by defendant's counsel to defend the constitutionality of the statute, there was no justiciable case or controversy. As a result, the Court was without jurisdiction to decide the issues presented and dismissal was required.

Plaintiffs appealed this order of dismissal. Pending argument of the appeal, on April 9, 1981, the Department of Justice under the new Attorney General notified the Court of Appeals that it would defend the constitutionality of § 399 on behalf of defendant. The Court of Appeals remanded the action to this Court for consideration of the effect of this development. On June 18, 1981 this Court vacated its order of

---

2. As promulgated in 1967, 47 U.S.C. § 399 provided: "No noncommercial educational broadcasting station may engage in editorializing or may support or oppose any candidate for political office." In 1973 a new subsection, § 399(b), was added to § 399. This addition, which is otherwise not relevant to the present action, required the redesignation of the original § 399 as § 399(a). The new subsection was deleted in 1981 and § 399(a) was again designated as § 399. At the same time § 399 was amended as discussed below. In order to avoid confusion, the court will refer to "§ 399" in discussing the history of this case despite the fact that the statute under scrutiny was designated "§ 399(a)" throughout most of this litigation.

3. Section 706(a) of the Ethics in Government Act of 1978, 2 U.S.C.A. § 288e(a) (West Supp. 1982) provides that the Senate may direct its counsel to appear as *amicus curiae* in its name in any legal action in which the powers and the responsibilities of Congress under the Constitution are placed in issue. Pursuant to this section, the Senate adopted Senate Resolution 328, directing the Senate Legal Counsel to appear in this case as *amicus curiae* in the name of the Senate. 125 Cong.Rec. S19431. Section 713(a) of the Ethics in Government Act, 2 U.S.C.A. § 288*l*(a) (West Supp.1982) provides that permission to appear as *amicus curiae* under § 706 "shall be of right." Permission may be denied only on an express finding that the appearance is untimely or that standing to intervene has not been established under Art. III. *Id.*

dismissal holding that "the Executive Branch's decision to enforce the statute has eliminated any uncertainty about the existence of an actual case or controversy." The appeal was subsequently dismissed and the Senate was granted leave to withdraw from this litigation.

Plaintiffs' original motion for summary judgment, which had been continued by stipulation pending resolution of the Senate's motion to dismiss, was thus again before the Court. Oral argument of this motion was set for August 3, 1981 and the parties were given an opportunity to file supplemental briefs.

Several days prior to the scheduled oral argument, however, Congress amended § 399 in a significant respect. The Court, therefore, continued oral argument of the plaintiffs' motion. On August 13, 1981 the President signed the Public Broadcasting Amendments Act of 1981, Pub.L.No. 97–35, 95 Stat. 725–36 (1981). This Act limited the scope of § 399's prohibition of editorializing to apply only to those public television and radio stations which receive grants from the federal government through CPB. No change was made in that portion of § 399 which prohibited all public broadcasters from supporting or opposing any candidate for political office.[4]

The parties were given an opportunity to file supplemental papers discussing the effect of this amendment, and plaintiffs were given leave to file an amended complaint to reflect this change. In the amended complaint, filed on October 2, 1981, plaintiffs altered the scope of this litigation in an important respect by dropping their challenge to that portion of § 399 which prohibits public broadcasting stations from supporting or opposing political candidates. Plaintiffs focused their attack instead solely on the statutory ban on editorializing by public broadcasters receiving federal grants from CPB.

Defendant moved to dismiss the amended complaint specifically basing its motion to dismiss on grounds identical to those raised in opposition to plaintiffs' original motion for summary judgment insofar as they were still applicable to the new complaint. In light of the long and convoluted procedural history of this case, the Court deemed plaintiffs' original motion for summary judgment to be before the Court as a motion for summary judgment on the amended complaint and treated defendant's motion to dismiss as a cross motion for summary judgment.

Oral argument of these motions was heard by this Court, the Honorable Malcolm M. Lucas, District Judge, presiding, on November 9, 1981 and taken under submission. After careful consideration of all of the papers filed and of the oral arguments of counsel, the Court grants summary judgment in favor of plaintiffs.

The material facts underlying this action are not disputed. Plaintiff League of Women Voters of California (the "League") is a non-profit, non-partisan organization incorporated in the State of California. One of the purposes of the League is to promote political responsibility through informed and active citizen participation in government. Plaintiff Henry Waxman ("Waxman") is a United States Congressman. Waxman is also a regular listener and a viewer of public radio and television.

Plaintiff Pacifica Foundation ("Pacifica") is a non-profit educational corporation which owns and operates noncommercial educational broadcasting stations in five major markets in the United States. Pacifica and its stations have received and presently receive grants from CPB and come, thus, within the scope of § 399's prohibition on editorializing.

Defendant FCC is an administrative agency created pursuant to the Communications Act of 1934, ch. 652, § 1, 48 Stat. 1064 (1934) (current version at 47 U.S.C. § 151

---

**4.** 47 U.S.C. § 399 as amended provides: "No noncommercial educational broadcasting station which receives a grant from the Corporation [CPB] under subpart C of this part [47 U.S.C. § 396] may engage in editorializing. No noncommercial educational broadcasting station may support or oppose any candidate for political office."

(1976)) for the purpose of regulating radio and wire communication. The FCC is charged with executing and enforcing the provisions of the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* (1976) which includes § 399 as amended.

This Court's order of June 18, 1981 vacating the Court's previous order of dismissal, makes clear that plaintiff Pacifica has standing to bring this action. As the Court noted in that order, Pacifica now faces "a very realistic threat of severe administrative and penal sanctions" if it violates § 399. Thus, Pacifica has a sufficient stake in the outcome of this litigation even without violating § 399 to warrant its invocation of federal court jurisdiction and to justify exercise of the Court's remedial powers on its behalf. *Babbitt v. United Farmworkers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

Plaintiffs League and Waxman seek no relief independent of the declaratory and injunctive relief sought by Pacifica. Thus, resolution of Pacifica's claims will effectively dispose of the claims raised by the League and Waxman. Under these circumstances, it is not necessary at this time to consider separately the question of whether the League and/or Waxman would have standing to maintain this action absent Pacifica. *Cf. Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977) (not necessary to examine the standing of all of the plaintiffs where one plaintiff had standing to raise the legal issues presented on appeal); *Legal Aid Society of Alameda County v. Brennan,* 608 F.2d 1319, 1334 (9th Cir. 1979) ("[I]t is unnecessary to examine the standing of all appellees so long as one had standing to secure the requested relief.")

Pacifica contends that § 399's prohibition of editorializing by certain public television and radio stations violates both the First Amendment and the Equal Protection Clause of the Fifth Amendment. The Court will address each of these challenges in turn.

## I. FIRST AMENDMENT CHALLENGE

Section 399 prohibits all editorializing by noncommercial educational television and radio stations which receive funds from CPB under 47 U.S.C. § 396 ("funded noncommercial broadcasters"). The FCC has construed § 399 as prohibiting only the "use of non-commercial educational broadcast facilities by licensees, their management or those speaking on their behalf for the propagation of the licensees' own views on public issues...." *In re Complaint of Accuracy in Media, Inc.,* 45 F.C.C.2d 297, 302 (1974). Section 399 does not, therefore, prevent funded noncommercial broadcasters from presenting a wide range of programs containing editorial content if it is made clear that the editorials are not made on behalf of the licensee or its management. Indeed, § 399 has even been construed as permitting "the expression of views on public issues by employees of a noncommercial educational broadcast station in their capacity as individuals ... provided the surrounding facts and circumstances do not indicate that such views are represented or intended as the official opinion of the licensee or its management." *In re Complaint of Accuracy in Media, Inc., supra,* 45 F.C.2d at 302. *See also, Walker & Salveter,* 32 Rad.Reg.2d 839, 846 (1955).[5]

Despite this narrow construction of § 399, it cannot be denied that the ban on editorializing limits the means by which certain noncommercial licensees may participate in the debate of issues of public interest and importance and, thus, raises a serious question under the First Amendment. *Consolidated Edison Co. v. Public Service Comm.,* 447 U.S. 530, 535, 100 S.Ct. 2326, 2331–32, 65 L.Ed.2d 319 (1980). The discussion of such issues lies at the heart of the

**5.** Although this interpretation of § 399 was developed in connection with the prior, broader version of § 399 set out above in footnote 1, there is no indication that the FCC will adopt a different position under the amended statute. Nor is there any indication that Congress, in amending § 399, intended to affect this interpretation.

First Amendment's protections. *See, First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707 (1978); *Mill v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966); *Thornhill v. Alabama,* 310 U.S. 88, 101–102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940).

Courts have consistently held that statutes restricting the discussion of public issues can withstand scrutiny under the First Amendment only if they serve a compelling state interest and are narrowly tailored to that end. *See, Consolidated Edison Co. v. Public Service Comm'n, supra,* 447 U.S. at 535, 540–544, 100 S.Ct. n.4, 2332, 2334–2336; *First Nat'l Bank of Boston v. Bellotti, supra,* 435 U.S. at 786, 98 S.Ct. at 1421; *Rosen v. Port of Portland,* 641 F.2d 1243, 1246 (9th Cir. 1981); *Community-Service Broadcasting v. FCC,* 593 F.2d 1102, 1111 (D.C.Cir. 1978).

Defendant has suggested, however, that "special," less stringent standards should be applied in this case because it involves the broadcast media. In support of this position, defendant cites the Supreme Court's statement in *FCC v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039–40, 57 L.Ed.2d 1073 (1978), that "of all forms of communication, it is broadcasting that has received the most limited First Amendment protection." This statement, however, taken out of context, is misleading. A more precise yet equally concise statement of the applicable principle is found in *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 (1969) where the Supreme Court recognized that "differences in the characteristics of new media justify differences in the First Amendment standards applied to them."

■ Thus, while it is true that some regulation of speech is permitted in the context of the broadcast media which would not be permitted with respect to speech communicated in some other fashion, any such result must be explicable in terms of differences in the characteristics of the broadcast media. For example, in *Pacifica Foundation, supra,* the Court upheld the FCC's power to impose informal sanctions against broadcasters of patently offensive speech on the basis of two special characteristics of the broadcast media. First, the Court noted that "because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content." *Id.,* 438 U.S. at 748, 98 S.Ct. at 3040. Second, the Court recognized the fact that "broadcasting is uniquely accessible to children." 438 U.S. at 749, 98 S.Ct. at 3040. These two special factors obviously have no relevance to consideration of the restriction on editorializing imposed by § 399. Other characteristics of broadcast media would have to be demonstrated and shown to require the limitation here at issue.

■ Defendant has not brought to the Court's attention any special characteristic of the broadcast media which would justify the application of less stringent First Amendment standards in the present case. Nor is the Court aware of any such special characteristics. The Court, therefore, rejects defendants' argument that review under the First Amendment of the ban on editorializing imposed by § 399 should be less stringent simply because it arises in the context of the broadcast media. Section 399 can survive scrutiny under the First Amendment only if it meets the standard generally used in First Amendment cases, that is, that it serves a compelling government interest and is narrowly tailored to that end.

■ It is well established that regulations such as § 399 are presumptively unconstitutional and that the government bears the burden of justification. *See Consolidated Edison Co. v. Public Service Comm'n, supra,* 447 U.S. at 540, 100 S.Ct. at 2334; *Rosen v. Port of Portland, supra,* 641 F.2d at 1246; *Kuszynski v. City of Oakland,* 479 F.2d 1130, 1131 (9th Cir. 1973). Defendant makes two arguments in attempting to meet its burden of justifying the restrictions upon speech imposed by § 399. First, defendant contends that § 399 serves a compelling government interest in ensuring that funded noncommercial broadcast-

ers do not become propaganda organs for the government. Second, defendant argues that § 399 serves a compelling government interest in preventing government funding from interfering with the balanced presentation of opinion on funded noncommercial stations. The Court will address each of these arguments in turn.

■ Defendant notes correctly that during the hearings and debates which preceded passage of the Public Broadcasting Act of 1967, several members of Congress expressed concern that government funding of noncommercial broadcasters brought with it the danger of government control. *See e.g.,* 113 Cong.Rec. 12,992 (1967) (remarks of Sen. Thurmond); 113 Cong. Rec. 26,384 (1967) (remarks of Rep. Staggers); 113 Cong. Rec. 26,394 (remarks of Rep. Brotzman).[6] The Court agrees that the fear of government control, if justified, might constitute a compelling government interest sufficient to justify the restrictions imposed by § 399. The evidence presented, however, indicates that this fear is not justified.

There is often reason to fear that "he who pays the piper calls the tune." Yet this fear is greatly reduced, where the "piper" receives funds from many different sources. Although little competent evidence has been presented to the Court, the parties agree that CPB funding in 1977 did not constitute more than approximately 25% of the funding received by funded noncommercial broadcasters and that no broadcaster receives more than approximately 33% of its funds through CPB grants. The parties also appear to agree that many of the stations which fall within the prohibition of § 399 receive substantially less than 25% of their funds in the form of CPB funding. Pacifica, for example, alleges

that it received only 14% of its total revenues from CPB Community Service Grants in 1978. It should also be noted that Congress has recently reduced the level of fundings authorized under 47 U.S.C. § 396 for fiscal years 1984–1986. Public Broadcasting Amendments Act of 1981, Pub. L.No. 97–35, § 1227, 95 Stat. 727 (1981) (to be codified at 47 U.S.C. § 396(k)(1)(C)). Such a reduction of funds can only serve to reduce the danger of government control. In light of the modest level of government funding, the expressed fear of government manipulation of the broadcast media does not seem to be justified.

This fear appears even more speculative when one considers the numerous additional safeguards which have been built into the funding system to ensure that funded noncommercial broadcasters remain free of government control. The CPB, which disburses all funds under 47 U.S.C. § 396, is an independent, non-profit, private corporation. It was established in this form specifically "to remove the [noncommercial] programming activity from governmental supervision." H.R.Rep.No.572, 90th Cong., 1st Sess. 19–20 (1967) *reprinted in* [1967] *U.S.Code Cong. & Ad.News* 1799, 1810. To this end, CPB is governed by an appointed Board of ten directors, no more than six of whom may be members of the same political party. 47 U.S.C.A. § 396(c)(1) (West Supp.1982).[7] The CPB cannot own or operate any station, network, or interconnection facility or produce, schedule or disseminate programming. 47 U.S.C.A. § 396(g)(3) (West Supp.1982). Furthermore, funding decisions are based on objective, nondiscretionary criteria. Thus, even were the CPB not sufficiently insulated from political control, it would be difficult to manipulate funding decisions along political lines.[8] No

---

6. The Court notes that some legislators also expressed personal concerns about permitting public broadcasters to editorialize. This aspect of the legislative history is discussed briefly in *Community-Service Broadcasting v. FCC,* 593 F.2d 1102, 1128 n.25 (D.C.Cir.1978). Clearly such personal interests are not legitimate government interests.

7. As amended by the Public Broadcasting Amendments Act of 1981, Pub.L.No. 97–35, § 1225, 95 Stat. 725–27 (1981).

8. *See,* Carnegie Commission on the Future of Public Broadcasting, *A Public Trust: The Report of the Carnegie Commission on the Future of Public Broadcasting,* 124–25 (1979):
   "Because eligibility for receipt of federal funds and the amount of the [grant] are de-

evidence has been presented which even suggests that CPB has failed in its statutory duty "to afford maximum protection [to public broadcasters] from extraneous interference and control." 47 U.S.C.A. § 396(a)(7) (West Supp.1982).

Even if the CPB were ineffective in insulating funded noncommercial broadcasters from governmental influence, still another safeguard works to ensure that such broadcasters will not become mouthpieces for the government. This protection is provided by the fairness doctrine.[9] This doctrine "imposes two affirmative responsibilities on the broadcaster: coverage of issues of public importance must be adequate and must fairly reflect differing viewpoints." *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 111, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973). Under this doctrine a broadcast licensee cannot present one-sided political propaganda for whatever reason.

The modest level of government funding, the protective insulation of the CPB, and the restrictions of the fairness doctrine all work to ensure that funded noncommercial broadcasters will not be vulnerable to attempts to use them as propaganda organs for the government. Nor will funded noncommercial broadcasters be influenced to take particular editorial positions in order to curry favor with the government. Both the "stick" and the "carrot" of federal funding have been effectively eliminated.

The legislative history of § 399 confirms that Congress did not view § 399's ban on editorializing as a necessary means to a compelling end. Rather, § 399 was added out of an "abundance of caution." H.R. Rep.No.572, 90th Cong., 1st Sess. 20 (1967) *reprinted in* [1967] *U.S.Code Cong. & Ad. News* 1799, 1810. Such prudence, while otherwise commendable, does not justify

§ 399's restriction on speech. The Court must, therefore, reject defendant's contention that fear of government control of funded noncommercial broadcasters presents a compelling government interest which will enable § 399's ban on editorializing to survive scrutiny under the First Amendment.

Defendant also argues that restrictions on editorializing are necessary to ensure that government funding of noncommercial broadcast stations will not interfere with the balanced presentation of opinion on those stations. This argument finds its origin in discussions held in the early years of the regulation of broadcasting. More than forty years ago, the FCC adopted a prohibition of all editorializing by broadcast stations, both commercial and noncommercial. *See In re Mayflower Broadcasting Corp.*, 8 F.C.C. 333, 339–341 (1940). This policy was reconsidered and abandoned by the FCC in 1949. In the report which led to this important policy change, the FCC discussed both the pros and cons of permitting broadcast licensees to editorialize. *In re Editorializing by Broadcast Licensees*, 13 F.C.C. 1246 (1949). Opponents of a change in policy argued that:

> [O]vert editorialization by broadcast licensees would not be consistent with the attainment of balanced presentations since there was a danger that the institutional good will and the production resources at the disposal of broadcast licensees would inevitably influence public opinion in favor of the positions advocated in the name of the licensee and ... having taken an open stand on behalf of one position in a given controversy, a license [*sic*] is not likely to give a fair break to the opposition.

*Id.*, at 1253. The FCC, while not entirely disagreeing with the assumptions underly-

---

termined by objective quantitative means, the system is well positioned to avoid review of program content as a condition for increased funding ... Thus, licensees do not really 'earn' their [grants] with any specific program or service."

9. For a summary of the development of the fairness doctrine see *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 375–386, 89 S.Ct. 1794, 1799–1804, 23 L.Ed.2d 371 (1969).

ing this line of argument, did not reach the same conclusion:

> If it be true that station good will and licensee prestige, where it exists, may give added weight to opinion expressed by the licensee, it does not follow that such opinion should be excluded from the air.... In any competition for public acceptance of ideas, the skills and resources of the proponents, and opponents will always have some measure of effect in producing the results sought. But it would not be suggested that they should be denied expression of their opinions over the air by reason of their particular assets ... Assurance of fairness must in the final analysis be achieved, not by the exclusion of particular views because of the source of the views, or the forcefulness with which the view is expressed, but by making the microphone available for the presentation of contrary views without deliberate restrictions designed to impede equally forceful presentation.

*Id.,* at 1253–54.

Defendant contends that Congress may well have decided to prohibit editorializing by funded noncommercial broadcasters because it agreed with the position taken by the FCC prior to 1949 rather than the position adopted in 1949. Defendant appears to argue that this pre-1949 position could have appeared especially convincing to Congress because a public broadcaster's good will and institutional prestige were, in large part, "created" by federal funding and were not truly "earned." There are, however, two problems with this argument. First, there is absolutely no indication that Congress did, in fact, originally enact or amend § 399 for the reasons suggested by defendant. Second, although there is much to be said for a complete prohibition of editorializing by all broadcast licensees as a rational attempt to foster balanced broadcasting, this concern is not sufficiently compelling to justify the ban on speech imposed by § 399 under the First Amendment. The protections offered by the fairness doctrine effec-

tively eliminate any substantial danger of "unbalanced" programming.

In sum, the Court holds that the right of funded noncommercial broadcasters to editorialize is entitled to the full panoply of First Amendment protections. There are no special characteristics of the broadcast media which justify the application of "special," less stringent First Amendment standards in this case. Defendants must therefore establish that § 399's ban on editorializing is narrowly tailored to serve a compelling government interest. Defendant has failed to carry this burden. The fear that funded noncommercial broadcasters will become propaganda organs for the government is too speculative to provide such a compelling interest. The desire to ensure the balanced presentation of opinion by funded noncommercial broadcasters, even if it had been a motivating factor in the passage of § 399, also fails to provide a sufficiently compelling interest to justify the ban on editorializing imposed by that statute. The Court holds that § 399 violates the First Amendment insofar as it prohibits funded noncommercial broadcasters from editorializing.

## II. THE FIFTH AMENDMENT CHALLENGE

Pacifica also challenges § 399 under the Equal Protection Guarantee embodied in the Due Process Clause of the Fifth Amendment. This guarantee, like the Equal Protection Clause of the Fourteenth Amendment, requires both that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives, and that any distinctions drawn between speakers must be carefully scrutinized. *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980). *See also Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972).

Pacifica argues that many noncommercial and commercial broadcasters which do not receive grants from CPB under 47 U.S.C. § 396 and which are, thus, not prohibited

**388**

from editorializing by § 399 are "just as likely if not more so, to fall prey to government coercion," as are funded noncommercial broadcasters. In support of this argument Pacifica notes that many noncommercial broadcasters receive substantial federal funds through various federal sources other than CPB and that many stations broadcast federally funded advertising. The discretionary allocation of these funds, Pacifica contends, brings with it a more serious danger of government control than that raised by CPB funding. In addition, plaintiff points to the licensing process itself as a potential source of federal coercive power over all broadcasters.

Pacifica argues that because the danger of government coercion through these other means is as great "if not greater" than the danger posed by CPB funding, it is a violation of the Equal Protection Guarantee to prohibit funded noncommercial broadcasters from editorializing but not to prohibit editorializing by those stations which receive federal funds from other sources or which undergo periodic license renewal.

While this argument may be well taken, the Court has difficulty adopting it in the context of this motion for summary judgment. There is little if any competent evidence before the Court from which to draw any justifiable conclusion as to the dangers inherent in these potential sources of coercive power. It is quite possible that the dangers noted by Pacifica do exist and that they are more substantial than the minimal risk of government control posed by CPB funding. Nevertheless, on the basis of the evidence now before the Court, it is not possible to grant summary judgment in favor of Pacifica under the Equal Protection Guarantee of the Fifth Amendment.

The Court, therefore, bases its decision squarely on the First Amendment, holding that the restrictions imposed upon editorializing by funded noncommercial broadcasters are not consistent with the guarantees of that amendment.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve, by United States mail, copies of this Order on counsel for all parties of record in this matter.

## SUMMARY JUDGMENT

This cause came on to be heard on motion of plaintiffs for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court having considered all pleadings, memoranda, and declarations submitted herein, and having heard the arguments of counsel, and having given due deliberation to this matter,

IT IS ORDERED that plaintiffs' motion for summary judgment is hereby granted, and further

ORDERED, ADJUDGED AND DECREED, that

1. The prohibition against editorializing contained in 47 U.S.C. § 399 is unconstitutional as a violation of the First Amendment to the United States Constitution, and is hereby declared null and void;

2. Defendant Federal Communications Commission and any of its agents, employees and others acting in concert with it are hereby enjoined from forcing or executing the prohibition against editorializing contained in 47 U.S.C. § 399;

3. Plaintiffs shall recover their costs and reasonable attorneys' fees.

IT IS FURTHER ORDERED that the Clerk shall serve, by United States mail, copies of this Judgment on counsel for all parties in this matter.