# Constitutionality of Legislation Prohibiting the Mailing of Sexually Oriented Advertisements

A draft bill that would prohibit the mailing of photographic sexually oriented advertisements without the addressee's prior written consent, and that would create strict criminal liability in any person who knowingly sends any sexually oriented advertisements to minors, regardless of whether the advertisements are photographic or not, would likely be held unconstitutional by the courts. The provisions in the draft bill are more extensive than necessary to support the interests asserted by the government, and thus would be held inconsistent with protections accorded commercial speech under the First Amendment.

August 9, 1984

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
OFFICE OF LEGISLATIVE AND INTERGOVERNMENTAL AFFAIRS

This responds to your memorandum seeking the views of this Office regarding the constitutionality of a draft bill, proposed by the Criminal Division, to restrict the mailing of photographic sexually oriented advertisements, "The Sexually Oriented Advertisements Amendments Act of 1984." The bill would amend § 3010 of title 39, the so-called Goldwater Amendment to the Postal Reorganization Act of 1970, Pub. L. No. 91–375, 39 U.S.C. §§ 101 *et seq.*, to create a *subcategory* of sexually oriented advertisements — the general category of sexually oriented advertisements is presently addressed by § 3010 — known as photographic sexually oriented advertisements. The bill would prohibit the mailing of such materials to any individual without his or her prior written consent. Section 1735 of Title 18 would be amended to provide a fine of "not more than $5,000 or imprison[ment of] not more than one year, or both" to willful violators of this provision. In addition, the bill would create strict criminal liability in any person who knowingly sends advertisements, photographic or otherwise, of a sexually oriented character to persons who are under the age of 18. The penalty for violation of this provision under the proposed amendments to 18 U.S.C. § 1735 would be a fine in an amount "not less than $50,000, nor more than $100,000." As amended, § 1735 would provide as an affirmative defense to prosecution for mailing sexually oriented ads to minors "that the minor solicited the mailing from the defendant, and that the defendant believed and had substantial reason to believe that the minor was eighteen years or older."

We believe that this proposed draft bill raises serious constitutional concerns when considered in light of recent decisions of the Supreme Court and lower

160

courts dealing with the government's authority to regulate sexually offensive commercial speech. These concerns arise primarily out of the bill's failure to strike what we believe the courts would find to be a constitutionally acceptable balance between the mailer's "right to use the mails [which] is undoubtedly protected by the First Amendment," *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 76 (1983) (Rehnquist, J. concurring) (citing *Blount v. Rizzi*, 400 U.S. 410 (1971)), and the individual's "right not to be assaulted by uninvited and offensive sights and sounds" "in the privacy of the home," *Bolger*, 463 U.S. at 77 (citing *FCC v. Pacifica Foundation*, 438 U.S. 726, 748 (1978)). Although the courts have recognized that the government clearly may act properly to protect people from unreasonable intrusions into their homes, we are persuaded that the protections currently provided by 39 U.S.C. § 3010 to unwilling recipients of unsolicited advertisements constitute the outer limits of the courts' willingness to uphold governmental prohibitions of commercial speech via the mails, of an offensive, though not "obscene,"[1] nature, absent a more substantial government interest than has been articulated by the Criminal Division.

Similarly, with regard to the draft bill's provisions concerning minors, although the courts have recognized, in certain circumstances, a "compelling" governmental interest in "'safeguarding the physical and psychological well-being of . . . minor[s]'" from participating in the production of non-obscene sexually offensive materials, *New York v. Ferber*, 458 U.S. 747, 757 (1982) (upholding criminal statute prohibiting the knowing promotion of child pornography by distributing materials depicting such) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)), the values protected by the First Amendment are generally no less applicable to protected materials merely because the government seeks to control the flow of information to minors. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975). *See also Bolger v. Youngs Drugs Products, Inc.*, 463 U.S. at 74 n.30 (Rehnquist, J. concurring). Although we recognize that the government has a strong interest in flatly prohibiting the mailing of sexually oriented advertisements, whether photographic or not, to minors, we have serious reservations regarding the ability of the draft bill's proposed strict liability for such distribution to withstand constitutional scrutiny in the courts. We believe that the courts, applying existing Supreme Court precedent, would find that the restrictions contained in the draft bill are more extensive than is necessary to support the

---

[1] The prevailing guidelines for determining obscenity, which is not protected by the First Amendment, were announced in *Miller v. California*, 413 U.S 15 (1973):

> (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id* at 24 (citations omitted). We understand that the term "sexually oriented advertisements," as defined in 39 U S.C. § 3010, is not intended by the drafters to include obscene materials within the meaning of *Miller*. For the purposes of the discussion in this memorandum, therefore, we will assume that there is a distinction between obscene materials and "sexually oriented advertisements."

government's asserted interest, in view of the adequacy of existing statutory provisions and regulations by which minors may be protected, the substantial burden which would be imposed upon mailers to determine the minority status of potential addressees, and the broad "prior restraining" effect that such an amendment would exert, in practice, on mailers with respect to material entitled to some protection under the First Amendment.

## I. Existing Law

At present, 39 U.S.C. § 3010 permits any unwilling recipient of sexually oriented advertisements

> on his own behalf or on the behalf of any of his children who has not attained the age of 19 years and who resides with him or is under his care, custody, or supervision, [to] file with the Postal Service a statement, in such form and manner as the Postal Service may prescribe, that he desires to receive no sexually oriented advertisements through the mails. The Postal Service shall maintain and keep current, insofar as practicable, a list of the names and addresses of such persons and shall make the list (including portions thereof or changes therein) available to any person, upon such reasonable terms and conditions as it may prescribe, including the payment of such service charge as it determines to be necessary to defray the cost of compiling and maintaining the list and making it available as provided in this sentence. No person shall mail or cause to be mailed any sexually oriented advertisement to any individual whose name and address has been on the list for more than 30 days.

*Id.* § 3010(b).[2] In addition, subsection (a) requires any person who mails sexually oriented advertisements to "place on the envelope or cover thereof his name and address as the sender thereof and such mark or notice as the Postal Service may prescribe." Postal Service regulations require, in part, that mailers of such materials place the legend "Sexually Oriented Ad" clearly on the front of the exterior envelope bearing such materials above the addressee's name; or, "if the contents of the mail piece are enclosed in a sealed envelope or cover, inside the exterior envelope or cover, [the mailer may place] conspicuously the words 'Sexually Oriented Ad'" on that inside cover. U.S. Postal Service, *Domestic Mail Manual* § 123.55(a) (incorporated by reference in 39 C.F.R. § 111.1 (1983)).

---

[2] 39 U.S.C. § 3010(d) defines "sexually oriented advertisement" as
> any advertisement that depicts, in actual or simulated form, or explicitly describes, in a predominantly sexual context, human genitalia, any act of natural or unnatural sexual intercourse, any act of sadism or masochism, or any other erotic subject directly related to the foregoing. Material otherwise within the definition of this subsection shall be deemed not to constitute a sexually oriented advertisement if it constitutes only a small and insignificant part of the whole of a single catalog, book, periodical, or other work the remainder of which is not primarily devoted to sexual matters.

162

Section 3011 provides the civil enforcement mechanism for violations of § 3010 and regulations duly promulgated thereunder by the Postal Service. Under this provision, the Postal Service may request the Attorney General to file a civil action on its behalf, seeking injunctive relief,[3] against any person whom the Postal Service believes "is mailing or causing to be mailed any sexually oriented advertisement in violation of [§ 3010]."

Criminal penalties for violations of 39 U.S.C. § 3010 are found at 18 U.S.C. §§ 1735 and 1737. Section 1735 provides a fine of "not more than $5,000 or imprison[ment of] not more than five years, or both, for the first offense and . . . not more than $10,000 or imprison[ment of] not more than ten years, or both, for any second or subsequent" violation of 39 U.S.C. § 3010. Section 1737 provides the same penalties for "print[ing], reproduc[ing], or manufactur[ing] any sexually related mail matter, intending or knowing that such matter will be deposited for mailing . . . in violation of [39 U.S.C. § 3010]."[4]

## II. The Constitutionality of the Proposed Amendments

### A. The Requirement of Prior Written Consent

As noted above, the draft bill seeks to prohibit the mailing of any photographic sexually oriented advertisement without the recipient's prior written consent.[5] The draft bill defines "photographic sexually oriented advertisement" as

> any sexually oriented advertisement, as defined in [39 U.S.C. § 3010(d)] consisting in whole or in part of photographs, unless the photographic material constitutes only a small and insignificant part of the whole advertisement.

The draft bill identifies a *subcategory* of sexually oriented advertisements which the drafters have determined to be "most offensive and intrusive" photographic materials and, regarding this subcategory of advertisements, the

---

[3] Although § 3011(a) provides for several kinds of injunctive relief, a three-judge panel of the U.S. District Court for the Central District of California held that the only constitutionally acceptable injunctive relief provided under § 3011(a) was that enjoining the defendant from mailing any sexually oriented advertisements to persons whose names are on the Postal Service list. *See United States v. Treatment*, 408 F. Supp. 944 (C.D. Cal. 1976). Notably, the court refused to construe the injunctive remedies set out in § 3011(a) constitutionally to enjoin mailing ads to persons who have *not* acted affirmatively either to put their names on the list or to request the advertising. *See id.* at 954.

[4] In addition to the provisions of §§ 3010 and 3011, unwilling recipients of "offensive" advertisements may avail themselves of the protective measures provided in 39 U.S.C. § 3008. Section 3008 prohibits "pandering advertisement[s] which offer[] for sale matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." This provision authorizes the recipient, upon receipt of such matter, to request the Postal Service to issue an order to the sender directing the sender "to refrain from further mailings to the named addressee" and "to delete immediately the names of the designated addressees from all mailing lists owned or controlled by the sender . . . [and to refrain] from the sale, rental, exchange or other transaction involving mailing lists bearing the names of the designated addressees." This order is enforceable through various administrative and judicial procedures.

[5] As the penalty provisions of the draft bill are primarily matters for policy consideration, on which we defer to the Criminal Division, we will confine our comments to the substantive portions of the draft bill and, as you have requested, only to those aspects which raise constitutional issues.

bill imposes an *affirmative* duty upon those who desire to receive such materials to provide the mailer with their prior written consent.[6] Thus, regarding this subcategory of advertisements, the draft bill goes considerably beyond the current requirement of § 3010 that the Postal Service maintain a list of persons desiring not to receive sexually oriented advertisements, and that mailers not send such materials to persons whose names have been on the list for more than 30 days. In effect, existing law requires unwilling recipients of unsolicited sexually oriented advertisements to "opt out" of the category of potential recipients of such materials; the draft bill would maintain this requirement, but regarding the subcategory of photographic sexually oriented ads, willing recipients would be required to "opt in" to the category of potential recipients.

The prevailing test for determining whether restrictions on commercial speech in any particular context are consistent with the First Amendment protections to which such speech is entitled was recently reiterated by the Supreme Court in *Bolger* v. *Youngs Drug Products Corp.*:

> "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n*, 447 U.S. [557,] 563 [1980]. In *Central Hudson* we adopted a four-part analysis for assessing the validity of restrictions on commercial speech. First, we determine whether the expression is constitutionally protected. For commercial speech to receive such protection, "it at least must concern lawful activity and not be misleading." *Id.* at 566. Second, we ask whether the governmental interest is substantial. If so, we must then determine whether the regulation directly advances the government interest asserted, and whether it is not more extensive than necessary to serve that interest. *Ibid.*

463 U.S. at 68–69.

Applying this analysis to photographic sexually oriented advertisements, we conclude first that such expressions are constitutionally protected. Unlike obscene materials, which are not entitled to First Amendment protections, *see*

---

[6] Although the determination that photographic sexually oriented advertisements are more "offensive" and "intrusive" than other sexually oriented materials may, in some circumstances, be an appropriate legislative judgment, we believe that the factual bases outlined in the Criminal Division memorandum for such a determination would, as a legal matter, be insufficient for the courts to sustain such a distinction for purposes of First Amendment analysis. *See Bolger* v. *Youngs Drug Products Corp., supra.*

However, even were "offensiveness" a permissible factor upon which the suppression of protected speech could be based — a proposition recently invalidated in *Bolger* v. *Youngs Drug Products Corp.*, 463 U.S. at 71–72 — a potentially more constitutionally defensible approach to dividing sexually oriented advertisements into more and less "offensive" categories would be to differentiate between pictorial materials and textual materials, rather than the approach taken in the draft bill. In attempting to distinguish, *within* the pictorial category, photographs, from graphics, cartoons, woodcuts and other pictorial media, as the most "offensive" and therefore the least protected category of sexually oriented ads, the draft bill may very well be constitutionally infirm as both overinclusive and underinclusive.

*Miller* v. *California*, 413 U.S. 15 (1973), sexually oriented advertisements constitute protected speech, assuming that the particular ads are neither false nor misleading, nor relate to unlawful activity.

The second prong of the *Bolger* test inquires into the substantiality of the government's interest in seeking to prohibit the mailing of photographic sexually oriented materials to all but those who have requested such materials in writing. The government's interest in prohibiting the mailings identified in the draft bill are similar, we believe,[7] to those advanced by the government, but held insufficient to justify the prohibition on mailing unsolicited contraceptive ads, in *Bolger* v. *Youngs Drug Products Corp.*[8] In *Bolger*, the government based its argument on its interest in (1) shielding recipients of mail from materials that they are likely to find offensive; and (2) aiding parents' efforts to control the manner in which their children become informed about sensitive subjects such as birth control. *See* 468 U.S. at 71.

In striking down the prohibition on unsolicited mailings of contraceptive advertisements as an unconstitutional restriction on commercial speech, the Court dismissed the government's interest in shielding recipients from unsolicited offensive materials as "carr[ying] little weight." *Id.* The Court reiterated its conclusion in *Carey* v. *Population Services International*, 431 U.S. 678, 701 (1977), that offensiveness is

> classically not a justification validating the suppression of expression protected by the First Amendment. At least where obscenity is not involved, we have consistently held that *the fact that protected speech may be offensive to some does not justify its suppression.*

463 U.S. at 71 (emphasis added).

In response to the government's argument that the statute was intended to prohibit the mailing of such unwanted materials into the home, the Court cited its recognition in *Rowan* v. *Post Office Department*, 397 U.S. 728 (1970), of unwilling recipients' rights, under the "pandering advertisements" law, 39 U.S.C. § 3008, *see supra* note 4, to give notice to a mailer that they wish no further mailings which they believe to be "erotically arousing or sexually provocative." The Court then stated:

> But we have never held that the government itself can shut off the flow of mailings to protect those recipients who might

---

[7] As best we are able to determine from the Criminal Division memorandum accompanying the draft bill, the government's interests underlying this proposal are as follows: (1) to identify a sub-category of "the most offensive and intrusive" sexually oriented ads; and (2) to protect "[t]he great majority of American people, who may not even know that they can put their names on a Postal Service list to avoid receiving such mail," from such offensive material.

[8] The statute at issue in *Bolger* was 39 U.S.C. § 3001(e)(2), which provided in pertinent part:

> Any unsolicited advertisement of matter which is designed, adapted, or intended for preventing conception is nonmailable matter, shall not be carried or delivered by mail, and shall be disposed of as the Postal Service directs unless the advertisement —
>
> (A) is mailed to a manufacturer of such matter, a dealer, therein, a licensed physician or surgeon, or a nurse, pharmacist, druggist, hospital, or clinic.

potentially be offended. The First Amendment "does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid objectionable speech." *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U.S. [530,] 542 [(1980)]. Recipients of objectionable mailings, however, may "'effectively avoid further bombardment of their sensibilities simply by averting their eyes.'" *Ibid.*, quoting *Cohen* v. *California*, 403 U.S. 15, 21 (1971). Consequently, the "short, though regular, journey from mail box to trash can . . . is an acceptable burden, at least so far as the Constitution is concerned." *Lamont* v. *Commissioner of Motor Vehicles*, 269 F. Supp. 880, 883 (S.D.N.Y.), *aff'd*, 386 F.2d 449 (2d Cir. 1967), *cert. denied*, 391 U.S. 915 (1968).

463 U.S at 72. Justice Rehnquist reiterated these views in his concurring opinion in *Bolger, id.* at 78:

[T]he recipient of [unsolicited] advertising "may escape exposure to objectionable material simply by transferring [it] from envelope to wastebasket." [*Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U.S. 530, 542 (1980)]. Therefore a mailed advertisement is significantly less intrusive than the daytime broadcast at issue in [*FCC* v.] *Pacifica Foundation*, 438 U.S. 726 (1978) . . . . Where the recipients can "'effectively avoid further bombardment of their sensibilities simply by averting their eyes,'" [*Consolidated Edison*, 447 U.S. at 542, quoting *Cohen* v. *California*, 403 U.S. 15, 21 (1971)], a more substantial government interest is necessary to justify restrictions on speech.

Thus, while we recognize that the government's interest in shielding unwilling recipients of "offensive" photographs of sexual objects or activities may be stronger than that associated with the contraceptive advertisements at issue in *Bolger*, the *Bolger* Court made clear that "offensiveness" is not a sufficient justification for restricting protected speech. The mere fact that the legislature may determine that one form or medium of protected speech is more offensive than another form of such speech would not entitle that speech to any less protection under the First Amendment. Moreover, we believe that as a general matter, the courts will not distinguish between various media through which protected speech is conveyed, for purposes of First Amendment analysis, absent a compelling reason to do so (*e.g.*, the broadcast media, which is "uniquely persuasive" and "uniquely accessible to children, even those too young to read," *FCC* v. *Pacifica Foundation*, 438 U.S. 726, 748 (1978)). We know of no compelling reason cognizable by the courts which would support the Criminal Division's proffered distinction between the advertisements in *Bolger* as "pamphlets containing 'truthful information relevant to important social issues'" (citing 463 U.S. at 69) and the photographic sexually oriented materials to which the bill is addressed.

166

The second interest asserted by the government in *Bolger*, a variation of which is also cited in the Criminal Division's memorandum accompanying the draft bill, was the government's interest in aiding parents in controlling the flow of information to their children regarding birth control. Although the Court found that this interest met the requirement that the government's interest be "substantial" in order to restrict commercial speech, 463 U.S. at 73, the Court held that prohibiting the unsolicited mailings of contraceptive advertisements, "as a means of effectuating this interest . . . fail[ed] to withstand scrutiny." *Id.* The government's interest in assisting parents to protect their children from exposure to unsolicited photographic sexually oriented advertisements is, we believe, similarly substantial.

In addition to meeting the "substantial governmental interest" prong of the *Bolger* test for restricting commercial speech, the draft bill, in order to withstand constitutional scrutiny, also must be shown to directly advance the government's interest and to be no more extensive than necessary to serve that interest. Although the draft bill appears to meet the third requirement under the *Bolger* test of directly advancing this government interest, we must conclude that it fails the fourth requirement of the *Bolger* test, *i.e.*, that it not be more extensive than necessary to serve that interest.

As noted above, although the *Bolger* court recognized the "substantiality" of the government's interest in protecting children from exposure to such materials, it dismissed the government's means of effecting this interest as "fail[ing] to withstand constitutional scrutiny." *Id.* at 73. In support of its conclusion, the Court noted that, in view of existing alternative means available for shielding children and other unwilling recipients from such materials, the regulation "provided only the most limited incremental support for the interest asserted." *Id.*[9] The Court's opinion, as well as Justice Rehnquist's concurring opinion, identified several means by which unwilling recipients could avoid the objectionable mailings. Each of these means may be utilized by parents seeking to protect their children from mailings containing the photographic sexually oriented advertisements sought to be restricted by the draft bill.

First, an individual who does not desire to receive commercial mailings which he, "in his sole discretion believes to be erotically arousing or sexually provocative" pursuant to 39 U.S.C. § 3008, may request the Postal Service, on his own behalf or that of his minor children under 19 years of age who reside with him, to issue an order to the mailer to refrain from further mailings to his address, and to delete his name "from all mailing lists owned or controlled by the sender . . . ." The restrictions contained in § 3008 were upheld by the Supreme Court in *Rowan* v. *Post Office Department*, 397 U.S. 728 (1970), as consistent with the First Amendment. The Court stated: "Weighing the highly

---

[9] The Court also noted that the regulation was "defective because it denies to parents truthful information bearing on their ability to discuss birth control and to make informed decisions in this area." *Id.* at 74. The Court concluded that "the restriction of 'the free flow of truthful information' constitutes a 'basic' constitutional defect regardless of the strength of the government's interest." *Id.* at 75 (quoting *Linmark Associates, Inc.* v. *Willingboro*, 431 U.S. 85, 95–96 (1977)).

167

important right to communicate . . . against the very basic right to be free from sights, sounds, and tangible matter we do not want, it seems to us that a mailer's right to communicate must stop at the mailbox of an unreceptive addressee." *Id.* at 737.

The second means by which a parent may insulate himself and his children from offensive mailings is by exercising his right under § 3010 to notify the Postal Service to add his family members' names to the list which the Postal Service is required to maintain of individuals who desire to receive no sexually oriented advertisements through the mails. Section 3010 prohibits mailers of such materials from sending mail to individuals whose names are on the list, under threat of civil and criminal penalties. Under the procedures outlined in both §§ 3008 and 3010, "individuals are able to avoid the information in advertisements after one exposure." *Bolger*, 463 U.S. at 78 (Rehnquist, J. concurring).

The third and fourth mechanisms available to parents to protect the sensibilities of themselves and their children from offensive material, should they not utilize the protective measures outlined in §§ 3008 and 3010, require the parent to recognize the nature of the material, either prior to opening or after, and take the "'short, though regular, journey from mailbox to trash can . . . .'" *Bolger*, 463 U.S. at 72 (quoting *Lamont* v. *Commissioner of Motor Vehicles*, 269 F. Supp. 880, 883 (S.D.N.Y.), *aff'd*, 386 F.2d 449 (2d Cir. 1967), *cert. denied*, 391 U.S. 915 (1968)). Because the recipients of such advertisements "'may escape exposure to objectionable material simply by transferring [it] from envelope to wastebasket,'" Justice Rehnquist concluded in his concurring opinion that mailed advertisements are "significantly less intrusive than the daytime broadcast at issue in [*FCC* v.] *Pacifica [Foundation*, 438 U.S. 726 (1978)]." 463 U.S. at 78 (quoting *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U.S. 530, 542 (1980)).

As noted above, Postal Service regulations require mailers of sexually oriented advertisements to mark clearly either the outer envelope or the exterior of an inner sealed envelope with the legend, "Sexually Oriented Ad," so that recipients may be put on notice that the mail's contents may be offensive, prior to opening. The fact that an over-zealous mail opener fails to heed the notice describing the mail's content, and subsequently is offended, is insufficient to burden the mailer's right to send his message through the mails. In short, "[w]here the recipients can 'effectively avoid further bombardment of their sensibilities simply by averting their eyes' . . . a more substantial government interest is necessary to justify restrictions on speech." 463 U.S. at 78 (Rehnquist, J., concurring) (quoting *Cohen* v. *California*, 403 U.S. 15, 21 (1971)).

Regarding children's access to the mail, the *Bolger* Court, noting that it is "reasonabl[e to] assume that parents already exercise substantial control over the disposition of mail once it enters their mailboxes," stated that to the extent that parents lose such control but nevertheless desire to protect their children from exposure to such mailings, protection could be achieved by "purging all mailboxes of unsolicited material that is entirely suitable for adults." 463 U.S at 73. The Court stated:

> We have previously made clear that a restriction of this scope is more extensive than the Constitution permits, for the government may not "reduce the adult population . . . to reading only what is fit for children." *Butler* v. *Michigan*, 352 U.S. 380, 383 (1957). The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox.

*Id.* at 73–74. *See also* 463 U.S. at 79 (Rehnquist, J., concurring) (noting that the regulation at issue in *Bolger* is "broader than is necessary because it completely bans from the mail unsolicited materials that are suitable for adults"). Indeed, Justice Rehnquist found the "[n]arrower restrictions, such as the provisions of 39 U.S.C. § 3008 . . . to be fully [capable of] serv[ing] the Government's interests." *Id.*[10]

For these reasons, we believe that the draft bill's prohibition on mailing photographic sexually oriented materials except to those persons who have consented in writing to receiving such materials, while implicating a substantial government interest, falls far short of the constitutional requirement that the regulation be no more extensive than necessary to serve that interest.[11]

Our conclusion is strongly supported by the Supreme Court's decision in *Lamont* v. *Postmaster General*, 381 U.S. 301 (1965), striking down an act requiring the Postmaster General to detain and deliver only upon the addressee's request unsealed foreign mailings of "communist political propaganda" as an unconstitutional limitation of an addressee's rights under the First Amendment. The Court stated that to require "the addressee[,] in order to receive his mail[,] to request in writing that it be delivered . . . amounts in our judgment to an unconstitutional abridgment of the addressee's First Amendment rights. The addressee carries an affirmative obligation which we do not think the Government may impose upon him." *Id.* at 307.[12]

---

[10] The Criminal Division has argued that, unlike the contraceptive materials in *Bolger*, the subcategory of photographic sexually oriented advertisements is "*uniquely* pervasive" or "*uniquely* accessible to children, even those too young to read," as was the offensive mid-afternoon broadcast in *FCC* v. *Pacifica*, 438 U.S. 726, 748 (1978) (emphasis added). However, we believe that the force of such an argument is severely undermined by the Court's recognition in *Bolger*, without regard to the content of the mails, that "[t]he receipt of mail is far less intrusive and uncontrollable [than the broadcast media;] . . the special interest of the federal government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication " 463 U.S at 74 Justice Rehnquist, in his concurring opinion, similarly rejected the proffered analogy between the broadcast media and the mails *Id.* at 78–79.

[11] The argument that the burden imposed by the restriction could be mitigated by the mailer conducting a "pre-mailing" to determine which potential addressees would be willing recipients of the materials, was soundly rejected by Justice Rehnquist in his concurring opinion in *Bolger*:

> [The pre-mailing argument] fall[s] wide of the mark. A prohibition on the use of the mails is a significant restriction of First Amendment rights. We have noted that "[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . " *Blount* v. *Rizzi*, 400 U.S 410. And First Amendment freedoms would be of little value if speakers had to obtain permission of their audiences before advancing particular viewpoints.

463 U.S. at 79–80 (citations omitted).

[12] *See also* 381 U.S at 309 (Brennan, J. concurring) (citations omitted):

> [T]he Government argues that, since an addressee taking the trouble to return the card can

Continued

169

Consistent with the Supreme Court's decision in *Lamont* is an opinion by a three-judge court in California, *United States* v. *Treatment*, 408 F. Supp. 944 (C.D. Cal. 1976), holding that enjoining a mailer from sending sexually oriented advertisements to anyone who has not affirmatively requested the material as a remedy under 39 U.S.C. § 3011 would be unconstitutional. In reaching this conclusion, the court observed that the mailer's right to communicate and the addressee's right to receive the mailing "are of such importance that the government has a very great burden to show a compelling interest for their curtailment." 408 F. Supp. 954. The court stated:

> The mailer's "right to communicate" as recognized in *Rowan* [v. *Post Office Department*, 397 U.S. 728 (1970)], is not overcome in this context because the addressees have not asserted a countervailing right of privacy. As to an addressee's right to receive a mailing, we do not think it can constitutionally be conditioned upon the requirement that the addressee request the material in advance. We believe this follows from *Lamont* [v. *Postmaster General*, 381 U.S. 301 (1965)] . . . .

> It is suggested that the statutory authorization of injunction against mailing to persons who have taken no affirmative action of their own should be validated on an agency theory. This theory is that the government may assert, as their agent, the right of privacy of those persons who have not affirmatively asked for the material. The asserted agency arises from the government's belief that sexually oriented material would be offensive to all recipients except those who have specifically asked for it and the government is merely asserting their right not to receive it. We reject the suggestion. As we read the decisions of the Supreme Court in the First Amendment area, *the government has no right to substitute its judgment for the judgment of the individual in deciding what materials he shall receive through the mails*. Such censorship cannot be exercised for the individual as purported agent, as *parens patriae* or otherwise . . . . And when the government can prohibit the people from receiving material through the mail which the government thinks should not be sent, and which the recipients have not asked to be protected from, the entire concept of free speech and free communication is dealt a devastating blow.

---

[12] (. . . continued)

receive the publication named in it, only inconvenience and not an abridgment is involved. But inhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government . . . . Moreover, the addressee's failure to return this form results in nondelivery not only of the particular publication but also of all similar publications or material. Thus, although the addressee may be content not to receive the particular publication, and hence does not return the card, the consequence is a denial of access to like publications which he may desire to receive. In any event, we cannot sustain an intrusion on First Amendment rights on the ground that the intrusion is only a minor one.

*Id.* (emphasis added). The court concluded that such an affirmative require-ment, similar to that contained in the draft bill, goes beyond what is necessary to afford a person whose name is not on the Postal Service list an opportunity to protect himself and his family from being forced to view offensive material when it reaches his mailbox. The court noted that Postal Service regulations promulgated pursuant to § 3010 require sexually oriented advertisements to be conspicuously so labeled, so that the person "who does not wish to see the material is forewarned and may chuck it in the wastebasket unopened," *id.* at 955, and that "once having received a single piece of sexually oriented adver-tising, he may have his name placed on the Postal Service list and be protected forever from receiving such material from the original or any other mailer." *Id.*

## B. Strict Liability for Mailing Sexually Oriented Ads to Minors

The draft bill also would impose a strict criminal liability upon those who mail any sexually oriented advertisements, whether or not of a photographic nature, to persons under the age of 18. An affirmative defense is provided if the minor solicited the mailing from the defendant and the defendant had substan-tial reason to believe that the minor was 18 years of age or older. The commen-tary accompanying the draft bill asserts an "undeniable government interest" in preventing the mailing of such matter directly to children.

As we noted above, the government interest in safeguarding the physical and psychological well-being of minors has been recognized by the courts as substantial. *See generally Bolger* v. *Youngs Drug Products Corp.*, *supra.* However, the decisions cited by the Criminal Division as support for the absolute prohibition on mailing to minors are inapposite. In *Ferber* v. *United States*, 458 U.S. 747 (1982), the Court upheld a criminal statute prohibiting the knowing promotion and distribution of child pornography, expressing a con-cern for the damage sustained by children who are used as subjects of porno-graphic materials to their physiological, emotional and mental health. The *Ferber* Court viewed the restrictions on the dissemination of materials depict-ing child pornography as a means of facilitating the enforcement of existing laws prohibiting the employment of children for pornographic purposes, and justified by the need to eradicate child pornography, illegal conduct in the State of New York. The case did not involve a restriction on mailing or distribution to minors alone. The Criminal Division's reliance upon *FCC* v. *Pacifica Foundation*, 438 U.S. 726, 748 (1978), is similarly misguided. The *Pacifica* Court upheld the Commission's determination that a monologue broadcast in mid-afternoon was "indecent" and therefore prohibited by the Communications Act, because of the "uniquely pervasive presence [of the broadcast media] in the lives of all Americans" and its unique accessibility to children. However, the *Bolger* Court dismissed the holding of *Pacifica* as inapplicable to unsolicited mailings, holding that "[t]he receipt of mail is far less intrusive and uncontrollable." 463 U.S. at 74.[13]

---

[13] The Court stated:
   Our decisions have recognized that the special interest of the federal government in regulation of
   Continued

171

*See also id.* at 78 (Rehnquist, J., concurring) (noting that mailed advertisements are "less intrusive than the daytime broadcast at issue in *Pacifica*, . . . [and, therefore,] a more substantial government interest is necessary to justify restrictions on speech").

Thus, recognizing that the government's interest in shielding minors from exposure to sexually oriented ads is a substantial one, we must determine, applying the *Bolger* test, whether the absolute restriction on the mailing of such materials to minors directly advances the government interest and whether it is not more extensive than necessary to serve that interest. *See* 463 U.S. at 69.

Although we acknowledge that the strict liability provision for mailings to minors directly advances the government's interest in shielding minors from such materials, we strongly believe that a court passing upon the constitutionality of the restriction would find it far more extensive than necessary to serve the government's interest. First, the existing provisions for protecting unwilling recipients from such mailings found at 39 U.S.C. §§ 3008 and 3010, when combined with appropriate parental supervision of children and of the mailbox, are sufficient, we believe, for the reasons stated in *Bolger*, to serve the government's asserted interest. *See Bolger* v. *Youngs Drug Products Corp.*, 463 U.S. at 79 (Rehnquist, J., concurring). As discussed above, these statutes provide the minor addressee and his or her parents with a variety of measures by which they may effectively avoid exposure to objectionable materials, *e.g.*, placing the minor's name on the Postal Service list to preclude receipt of such materials, or, upon receipt, observing the warnings which Postal Service regulations require to be placed on such materials.

Moreover, much of the material that is embraced by this amendment, the *general* category of sexually oriented ads described in § 3010(d), may very well be materials similar to the ads at issue in *Bolger*, or other sexually oriented materials that are equally prevalent among youths in our society today. Regarding such materials, the *Bolger* court observed that "parents must already cope with the multitude of external stimuli that color their children's perception of sensitive subjects," and found that an outright prohibition on such materials achieved only a "marginal degree of protection." 463 U.S. at 73.[14] In such circumstances, the Court held, an outright restriction is "more extensive than the Constitution permits." *Id.*

Although the *Bolger* opinion did not address an outright restriction on unsolicited mailings which is limited to minors, we believe that because of the

---

[13] (. . . continued)
the broadcast media does not readily translate into a justification for regulation of other means of communication. *See Consolidated Edison Co.* v. *Public Service Comm'n* 447 U.S. at 542–543; *FCC* v. *Pacifica Foundation*, 438 U.S. at 748 (broadcasting has received the most limited First Amendment protection).
*Id.* (footnote omitted).

[14] The Court explained:
Under [today's] circumstances, a ban on unsolicited advertisements serves only to assist those parents who desire to keep their children from confronting such mailings, who are otherwise unable to do so, and whose children have remained relatively free from such stimuli.
463 U.S. at 73.

172

near impossibility of mailers being able to determine the ages of potential recipients — without conducting a verifiable "pre-mailing" survey of the addressees — the practical effect of the restriction's limitation to minors is virtually nonexistent. In other words, the mailer, in order to avoid the strict liability imposed by the statute, must: (1) send his ads only to those who affirmatively request them and attest to being at least 18 years of age, and whom the mailer has substantial reason to believe are 18 years of age or older; (2) conduct a "pre-mailing" survey to determine the ages of potential recipients; or (3) continue to conduct mailings as he has in the past, but at the risk that some addressees might be minors. We believe that the practical effect of this amendment would be to impose such a substantial burden on mailers as to raise serious constitutional difficulties.

The burden imposed by such legislation, to ascertain the ages (or at least the majority or minority status) of all addressees, would, in our opinion preclude the use of the mails by forcing all but the most determined and enterprising mailers out of business. Because this amendment includes *all* sexually oriented advertisement materials, whether photographic or not, the draft bill would force the mailers of such materials, presently prohibited by § 3010(d) from sending their material *only* to those on the Postal Service list, to send their materials at the risk that any potential addressee may be under 18. As noted above, the practical effect of this amendment would be to require the prudent mailer to send his sexually oriented advertisements, whether photographic or not, only to those persons who have affirmatively requested his materials and only those whom he reasonably believes to be at least 18 years of age, or, to conduct a pre-mailing survey. This restriction, as applied to the subcategory of "the most offensive" and intrusive ads — photographic sexually oriented ads — fails, as we indicated in Part II.A above, to properly balance the advertiser's right to communicate through the mails, the addressee's right to receive his or her mail, and the individual's right to privacy in his home. A *fortiori*, this conclusion would apply to the general category of sexually oriented ads. Regarding pre-mailing surveys, as noted above, Justice Rehnquist, in his concurring opinion in *Bolger*, found such a requirement to be a "prohibition on the use of the mails [and therefore] a significant restriction of First Amendment rights." 463 U.S. at 79–80. Thus, we believe the courts would find such a burden on the mailers to be constitutionality unacceptable.

## Conclusion

Although we recognize that the government has a strong interest in protecting recipients of unsolicited sexually oriented advertisements of any kind from being unwillingly subjected to materials which they may find offensive, such an interest has been held not to be substantial, for purposes of restricting commercial speech. Moreover, notwithstanding that the courts have found the government's interest in protecting parents' ability to control their children's exposure to potentially offensive, or otherwise sensitive, materials to be sub-

173

stantial, we conclude, applying the principles set forth in *Bolger*, that, in view of the adequacy of existing statutory and regulatory provisions designed to foster that interest, and the "prior restraining" effect that the absolute prohibition on mailing to minors would have on the mailers' constitutional right to communicate through the mails, the strict liability provisions of the draft bill would be unable to withstand constitutional scrutiny. In short, it is our conclusion that the statutory prohibitions envisioned by both provisions of the draft bill would be found by courts to be more extensive than necessary to support the interests asserted by the government, and therefore inconsistent with the protections accorded to commercial speech under the First Amendment.

RALPH W. TARR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
